**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB,
*Petitioners*,

v.

UNITED STATES DEPARTMENT OF ENERGY,
*Respondent*,

ALASKA GASLINE DEVELOPMENT CORPORATION and
ALASKA LNG PROJECT, LLC,
*Respondent-Intervenors*.

Petition for Review of United States Department of Energy Decisions

―――――――――――――――――――――――――――

**PETITIONERS' OPENING BRIEF**

―――――――――――――――――――――――――――

| | | |
|---|---|---|
| Erin Colón | Jason C. Rylander | Nathan Matthews |
| EARTHJUSTICE | CENTER FOR | SIERRA CLUB |
| 441 W 5th Avenue, Suite 301 | BIOLOGICAL DIVERSITY | 2101 Webster Street, Suite 1300 |
| Anchorage, AK 99501 | 1411 K St. NW, Suite 1300 | Oakland, CA 94612 |
| T: 907.277.2500 | Washington, D.C. 20005 | T: 415.977.5695 |
| | T: 202.744.2244 | |
| *Attorney for Petitioner Center for Biological Diversity* | *Attorney for Petitioner Center for Biological Diversity* | *Attorney for Petitioner Sierra Club* |

*Additional Counsel Listed on Inside Cover*

*December 15, 2023*

Moneen Nasmith
EARTHJUSTICE
48 Wall Street, 15th Fl.
New York, NY 10005
T: 212.845.7384

Ann Jaworski
EARTHJUSTICE
311 S. Wacker Drive, Suite 1400
Chicago IL 60606
T: 773.245.0837

*Attorneys for Petitioner Center for Biological Diversity*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**(A) Parties and Amici.**

| | |
|---|---|
| Petitioners: | Center for Biological Diversity |
| | Sierra Club |
| Respondent: | U.S. Department of Energy |
| Respondent-Intervenors: | Alaska Gasline Development Corporation |
| | Alaska LNG Project, LLC |
| Amici: | No individuals or entities have sought leave to participate as amicus curiae. |

**(B) Rulings Under Review.** The following orders are at issue in this Court: the U.S. Department of Energy's ("the Department") final opinion and order granting long-term authorization to export liquified natural gas for the Alaska LNG Project under Section 3 of the Natural Gas Act, DOE000107 (Order 3643-A (Aug. 20, 2022)); the Department's order affirming and amending Order 3643-A, DOE000162 (Order 3643-C (Apr. 13, 2023)); and the Department's order denying Petitioners' request for rehearing and affirming Order 3643-C, DOE000175 (Order 3643-D (June 14, 2023)).

**(C) Related Cases.** *Sierra Club v. U.S. Department of Energy*, Case No. 20-1503.

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioners Center for Biological Diversity and Sierra Club are non-profit conservation organizations. Neither of them has any parent companies, subsidiaries, or affiliates that have issued shares to the public.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

RULE 26.1 DISCLOSURE STATEMENT............................................ ii

TABLE OF CONTENTS.................................................................... iii

TABLE OF AUTHORITIES ...............................................................v

GLOSSARY.......................................................................................ix

JURISDICTIONAL STATEMENT ....................................................1

STATEMENT OF ISSUES ................................................................2

STATUTES AND REGULATIONS ...................................................3

STATEMENT OF THE CASE............................................................3

    I.    Statutory framework. .................................................................3

    II.    Factual and procedural background...........................................5

SUMMARY OF ARGUMENT .........................................................13

STANDING .....................................................................................15

ARGUMENT ...................................................................................19

    I.    Standard of review...................................................................19

    II.    The Department's approval of the Project under the Gas Act was arbitrary and capricious................................................................20

        A.    The Department's treatment of the Project's climate harms was arbitrary and capricious.........................................................21

        B.    The Department ignored uncertainties regarding the Project's benefits. .................................................................................31

        C.    The Department relied on unsupported assumptions about mitigation to ignore the Project's environmental harms.........................36

        D.    Petitioners' Gas Act arguments are properly before this Court. .............38

III.  The Department's environmental review of the Project violated
      NEPA. ....................................................................................................44

   A.  The Department failed to identify even a remotely realistic no
       action alternative, rendering its analysis of climate impacts
       meaningless. ...........................................................................................45

   B.  The SEIS does not comply with NEPA regulations regarding
       missing information. ................................................................................52

IV.  This Court should vacate and remand the Department's orders
     granting export approval. ...........................................................................56

CONCLUSION ...................................................................................................58

CERTIFICATE OF COMPLIANCE....................................................................60

CERTIFICATE OF SERVICE ..............................................................................61

TABLE OF EXHIBITS .......................................................................................T-i

ADDENDUM ..................................................................................................... A-i

# TABLE OF AUTHORITIES

## CASES

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ............................................................. 56

*Am. Rivers v. FERC*,
  895 F.3d 32 (D.C. Cir. 2018) ................................................................. 4

*Anglers of the Au Sable v. U.S. Forest Serv.*,
  565 F. Supp. 2d 812 (E.D. Mich. 2008) .............................................. 46

*Assn. of Oil Pipe Lines v. FERC*,
  281 F.3d 239 (D.C. Cir. 2002) ............................................................. 27

*Balt. Gas & Elec. Co. v. Natural Res. Defense Council*,
  462 U.S. 87 (1983) ............................................................................... 45

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
  781 F.3d 1271 (11th Cir. 2015) ........................................................... 57

*Burlington Truck Lines v. United States*,
  371 U.S. 156 (1962) ............................................................................. 54

*Cannon v. District of Columbia*,
  717 F.3d 200 (D.C. Cir. 2013) .............................................. 4, 7, 8, 18

*Columbia Gas Transmission Corp. v. FERC*,
  477 F.3d 739 (D.C. Cir. 2007) ...................................................... 39, 41

*Competitive Enter. Inst. v. Fed. Commc'ns Comm'n*,
  970 F.3d 372 (D.C. Cir. 2020) ............................................................. 18

*Ctr. for Biological Diversity v. FERC*,
  67 F.4th 1176 (D.C. Cir. 2023) ................................................. 8, 48, 49

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
  623 F.3d 633 (9th Cir. 2010) ............................................................... 46

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004) ............................................................................. 17

*Diné Citizens Against Ruining Our Env't v. Haaland*,
    59 F.4th 1016 (10th Cir. 2023) ............................................................57

*Eagle Cnty., Colo. v. Surface Transp. Bd.*,
    82 F.4th 1152 (D.C. Cir. 2023) .......................................................32, 43

*Fore River Residents Against the Compressor Station v. FERC*,
    77 F.4th 882 (D.C. Cir. 2023) ............................................................39

*Friends of Southeast's Future v. Morrison*,
    153 F.3d 1059 (9th Cir. 1998) ............................................................46

*Gen. Chem. Corp. v. U.S.*,
    817 F.2d 844 (D.C.Cir.1987) (per curiam) .....................................27

*High Country Conservation Advocs. v. U.S. Forest Service*,
    52 F. Supp. 3d 1174 (D. Colo. 2014) ................................................50

*Hunt v. Washington State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ............................................................................15

*In re Idaho Conservation League*,
    811 F.3d 502 (D.C. Cir. 2016) ...........................................................19

*Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*,
    920 F.2d 960 (D.C. Cir. 1990) ...........................................................56

*LePage's 2000, Inc. v. Postal Regul. Comm'n*,
    642 F.3d 225 (D.C. Cir. 2011) ...........................................................28

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) ............................................................................45

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
    345 F.3d 520 (8th Cir. 2003) .............................................................29

*Mont. Env't Info. Ctr. v. U.S. Office of Surface Mining*,
    274 F. Supp. 3d 1074 (D. Mont. 2017),............................................49

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..............................................................20, 27, 54

*Nat'l Parks Conservation Ass'n v. EPA*,
788 F.3d 1134 (9th Cir. 2015) ...................................................27

*National Ass'n of Regulatory Utility Comm'rs v. U.S. Dep't of Energy*,
736 F.3d 517 (D.C. Cir. 2013).............................................24, 47

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
896 F.3d 520 (D.C. Cir. 2018)..................................................57

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*,
374 F.3d 1209 (D.C. Cir. 2004)................................................29

*Realty Income Tr. v. Eckerd*,
564 F.2d 447 (D.C. Cir. 1977)..................................................57

*S. Nat. Gas. Co. v. FERC*,
877 F.2d 1066 (D.C. Cir. 1989)................................................39

*Sierra Club v. FERC*,
827 F.3d 59 (D.C. Cir. 2016).....................................................17

*Sierra Club v. U.S. Dep't of Energy*,
867 F.3d 189 (D.C. Cir. 2017)............................................19, 21

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
985 F.3d 1032 (D.C. Cir. 2021)................................................57

*Steubing v. Brinegar*,
511 F.2d 489 (2nd Cir. 1975) ..................................................58

*United Steel v. Mine Safety & Health Admin.*,
925 F.3d 1279 (D.C. Cir. 2019)................................................56

*United Transp. Union v. Interstate Com. Comm'n*,
891 F2d 908 (D.C. Cir. 1989)...................................................18

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
6 F.4th 1321 (D.C. Cir. 2021)...................................................43

*WildEarth Guardians v. Bureau of Land Mgmt.*,
870 F.3d 1222 (10th Cir. 2017) ...............................................49

# STATUTES

5 U.S.C. § 706(2) .................................................................56

15 U.S.C. § 717b .............................................................1, 2, 3

15 U.S.C. § 717r(a) ...........................................................39

15 U.S.C. § 717r(b) .......................................................1, 39

42 U.S.C. § 4332(2)(C) (2022) .......................................4

Pub. L. No. 118-5, 137 Stat. 38 ....................................4

# REGULATIONS

10 C.F.R. § 1021.103 .........................................................4

40 C.F.R. § 1502.14(a) ......................................................4

40 C.F.R. § 1502.14(c) ..................................................4, 46

40 C.F.R. § 1502.16(a) ......................................................5

40 C.F.R. § 1502.21 ...............................48, 52, 53, 54, 55

40 C.F.R. § 1508.1(g) ........................................................5

# FEDERAL REGISTER NOTICES

46 Fed. Reg. 18,026 (Mar. 23, 1981) ......................5, 46

88 Fed. Reg. 49,924(July 31, 2023) ..........................44

# RULES

Fed. R. Evid. 201 .....................................................4, 7, 8, 18

# GLOSSARY

| | |
|---|---|
| Alaska LNG | Alaska LNG Project, LLC |
| Department | U.S. Department of Energy |
| EIS | Environmental impact statement |
| EPA | U.S. Environmental Protection Agency |
| FERC | Federal Energy Regulatory Commission |
| Gas Act | Natural Gas Act |
| GHG | Greenhouse gas |
| LNG | Liquefied natural gas |
| NEPA | National Environmental Policy Act |
| NERA | National Economic Research Associates |
| Project | Alaska LNG Project |
| SEIS | Supplemental environmental impact statement |

# JURISDICTIONAL STATEMENT

This Court has jurisdiction under 15 U.S.C. § 717r(b) to review these consolidated petitions challenging Department of Energy ("the Department") orders granting approval for export of liquefied natural gas (LNG) under Section 3 of the Natural Gas Act ("Gas Act"), 15 U.S.C. § 717b.

The Department approved LNG export from the Alaska LNG Project ("Project") to non-free trade agreement countries and granted Sierra Club intervention. DOE000107 (Order 3643-A). Sierra Club timely petitioned for rehearing, DOE000109 (Request for Rehearing, (Sept. 21, 2020)), and timely petitioned this Court for review, No. 20-1503 (filed Dec. 16, 2020). The Department granted partial rehearing to prepare a supplemental environmental impact statement (SEIS), DOE000126 (Order 3643-B (Apr. 15, 2021)), and the Court stayed Sierra Club's case, No. 20-1503, Order (issued June 30, 2021).

After issuing the SEIS, the Department affirmed its export approval and granted Center for Biological Diversity intervention, DOE000162 (Order 3643-C). Sierra Club and Center for Biological Diversity timely petitioned for rehearing, DOE000171 (Request for Rehearing (May 15, 2023)), then after the Department denied rehearing, DOE000175 (Order 3643-D), timely petitioned this Court for review, *Center for Biological Diversity et al. v U.S. Department of Energy,* No. 23-1214 (filed Aug. 11, 2023).

# STATEMENT OF ISSUES

1. Whether the Department's determination that the Project is not inconsistent with the public interest under the Gas Act, 15 U.S.C. § 717b, was arbitrary and capricious because:

    a. The Department overstated the uncertainty of expected climate harms, especially in comparison to the uncertainty of expected benefits.

    b. The Department inconsistently treated uncertainties regarding the amount of gas the Project will ultimately export as undermining the likelihood of the Project's harms, but not as undermining its benefits.

    c. The Department ignored significant non-climate harms based on unsubstantiated assumptions about mitigation.

    d. Petitioners' Gas Act arguments are properly before this Court.

2. Whether the Department's environmental review of the Project violated the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370m, because:

    a. The Department did not examine a realistic no action alternative.

    b. The Department did not comply with NEPA regulations regarding missing information.

# STATUTES AND REGULATIONS

Pertinent statutes and regulations appear in the appended addendum.

# STATEMENT OF THE CASE

## I.  Statutory framework.

Section 3 of the Gas Act provides the Department shall authorize gas exports to nations with which the United States has not entered into a free trade agreement[1] "unless . . . it finds that the proposed exportation . . . will not be consistent with the public interest." 15 U.S.C. § 717b(a). The statute does not define "public interest" or require the Department to consider specific criteria when making authorization decisions, but the Department considers "factors includ[ing] economic impacts, international impacts, security of natural gas supply, and environmental impacts, among others" and looks to principles established in the Department's 1984 Policy Guidelines. DOE000107 at 10-11 (Order 3643-A). No U.S. LNG export facility

_____

[1] The United States only has free trade agreements with Australia, Bahrain, Canada, Chile, Colombia, Dominican Republic, El Salvador, Guatemala, Honduras, Jordan, Mexico, Morocco, Nicaragua, Oman, Panama, Peru, Republic of Korea, and Singapore. DOE000175 at 1 n.3 (Order 3643-D).

has been constructed without authorization to export to non-free trade agreement countries.[2]

NEPA's "primary function" is "compelling federal agencies to take a hard and honest look at the environmental consequences of their decisions." *Am. Rivers v. FERC*, 895 F.3d 32, 49 (D.C. Cir. 2018). It requires that agencies prepare an environmental impact statement (EIS) before all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C) (2022).[3] The EIS must discuss "the environmental impact of the proposed action," "any adverse environmental effects which cannot be avoided should the proposal be implemented," "alternatives to the proposed action," and "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity." *Id.* The Department has adopted the Council on Environmental Quality's NEPA regulations, 10 C.F.R. § 1021.103, which require that agencies "[e]valuate reasonable alternatives to the proposed action," including a no action alternative, *id.* § 1502.14(a), (c); and

---

[2] *Compare* Ex. 1 at 1-2 *to* Ex. 2 at 1. The Court may take judicial notice of this data because it is posted on government websites and is not subject to dispute. *See Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013); Fed. R. Evid. 201. *See also* Dep't of Energy, Office of Fossil Energy and Carbon Mgmt. Order No. 3784 (Feb. 8, 2016) (granting export approval for sixth existing export terminal).

[3] All NEPA cites are to the 2022 version (reproduced in the statutory addendum) in effect when the Department issued the SEIS. NEPA was later amended by Pub. L. No. 118-5, 137 Stat. 38.

discuss the "reasonably foreseeable" direct, indirect, and cumulative environmental impacts of the proposed action and alternatives, *id.* §§ 1502.16(a), 1508.1(g). A no action alternative describes the world as it would be if the agency did not take the proposed action. 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981) (Question 3).

## II.    Factual and procedural background.

Intervenor Alaska LNG Project, LLC ("Alaska LNG") applied to the Department for approval to export gas from its proposed Project in 2014. DOE000107 at 1 (Order 3643-A). The proposed Project would source gas from Alaska's North Slope and would include: (1) a gas treatment plant on the North Slope; (2) an 800-mile-long pipeline to transport gas to a liquefaction facility; and (3) a liquefaction facility to be constructed by Intervenor Alaska Gasline Development Corporation on the Kenai Peninsula in southcentral Alaska. DOE00162 at 1-2 (Order 3643-C). Gas collected during oil production on the North Slope is currently re-injected for enhanced oil recovery but is not sold commercially because there is no gas pipeline infrastructure connecting the remote North Slope to any gas market. DOE000152 at 2-12 to 2-14 (SEIS); DOE000126 at 14 (Order 3643-B). The pipeline would bisect the entire state from the North Slope to the Kenai Peninsula, and run directly adjacent to Denali National Park and Preserve, as depicted in the following map.



DOE000152 at 1-2, Fig. 1.1-1 (SEIS).

The Project itself would permanently destroy over 8,000 acres of wetlands; have significant effects on permafrost, wetlands, forests, and caribou; and potentially cause significant impacts on air quality and visibility at several national parks, preserves, and refuges. DOE00097 at ¶¶25, 84, 160, 206-08 (FERC order). The Project would also increase the risk of vessel strikes on critically endangered Cook Inlet beluga whales and adversely affect their critical habitat. DOE00093 at 4-514, Tbl. 4.8.1-6 (FERC EIS). Not counting emissions from the end use of its gas exports, the Project's construction and 33 years of operation would directly emit 329-540 million metric tons of $CO_2$ equivalent. DOE00098 (FERC Order) at 74, ¶214 (providing total construction emissions and annual operation emissions). The impact of those emissions on the climate is comparable to that of operating 827 to 1,357 gas-fired power plants for one year.[4]

In a 2014 order not at issue in this case, the Department granted the required automatic approval for the Project to export to free trade agreement countries. DOE000107 at 3 (Order 3643-A). *See infra* pp. 17-19 (explaining that the Project would not proceed based on export to free trade agreement countries alone). The Federal Energy Regulatory Commission (FERC) granted approval to construct the

---

[4] Ex. 3 at 11, 15. Petitioners request the Court take judicial notice of this information. *See Cannon*, 717 F.3d at 205 n.2; Fed. R. Evid. 201.

Project's pipeline and liquefaction facilities in 2020,[5] after preparing an EIS for which the Department was a cooperating agency. DOE000107 at 5, 24 (Order 3643-A).

In 2020, the Department authorized the Project to export up to 929 billion cubic feet per year of gas to non-free trade agreement countries for a total of 33 years. DOE000107 at 36-37, 40 (Order 3643-A). For context, 929 billion cubic feet is nearly one fifth of all gas delivered to residential consumers in the United States in 2022,[6] and, if burned for energy, would create greenhouse gas (GHG) emissions equivalent to operating 128 gas-fired power plants for one year.[7] The authorization order reaffirmed a previous Department finding that the Project would have economic benefits, and also found energy security benefits. DOE000107 at 3-4, 31 (Order 3643-A). The Department relied on FERC's EIS to analyze the harms from the pipeline and terminal but did not prepare its own Project-specific EIS analyzing harms associated with producing and exporting the Project's LNG and did not consider those environmental harms in approving the Project's exports. *Id.* at 32.

---

[5] Petitioners in this case also challenged FERC's approval, and this Court upheld it. *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176 (D.C. Cir. 2023).
[6] As reported by the U.S. Energy Information Administration. Ex. 4. Petitioners request the Court take judicial notice of this data. *See Cannon*, 717 F.3d at 205 n.2; Fed. R. Evid. 201.
[7] Ex. 3 at 3; *infra* fn.4.

Sierra Club requested rehearing, DOE000109 (Request for Rehearing (Sept. 21, 2020)), and petitioned this Court for review.

The Department then granted partial rehearing. DOE000126 (Order 3643-B). In its rehearing order, the Department acknowledged executive orders that require federal agencies to assess, disclose, and mitigate climate pollution and "combat the climate crisis." *Id.* at 12-13. Increasing global atmospheric concentrations of GHGs are accelerating the warming of our climate, with far-ranging consequences such as extreme weather events, sea level rise, changes in animal abundance and distribution, and wildfires. DOE000152 at 3.19-1 to 3.19-14 (SEIS).

The Department found it was "prudent" and "necessary" to prepare a SEIS examining: (1) a lifecycle analysis of GHG emissions from Project operations and combustion of the exported LNG; and (2) upstream environmental impacts associated with gas production on the North Slope. *Id.* at 13-14. This Court stayed Sierra Club's case in the interim. No. 20-1503, Order (issued June 30, 2021).

In 2023, the Department issued a final SEIS. DOE000152 (SEIS). The SEIS did not predict the Project's impact on global energy consumption and GHG emissions. Citing "inherent uncertainty regarding the particular present or future supply and demand responses that would lead to net changes in production and consumption," the Department presented two no action alternatives as "different

perspectives" for assessing the Project's net climate impacts. *Id.* at 4.19-5. Those

perspectives represented opposite extreme potentialities. In the first no action

scenario, the Department posited that, absent the Project, all the LNG to be

produced by the Project would be produced by other sources. *Id.* at S-7; *see also*

DOE000162 at 24 (Order 3643-C) (describing this alternative as "perfect

substitution of LNG"). In the second no action scenario, absent the Project, there

would be no equivalent delivery of fossil fuels to the market. DOE000152 at S-7

(SEIS); *see also* DOE000162 at 24 (Order 3643-C) (describing this alternative as

"no energy market substitution").

Compared to alternative sources of LNG the Department evaluated, the SEIS

concluded the Project could reduce global GHG emissions by as much as 274

million metric tons of $CO_2$-equivalent. DOE000152 at S-8, Table S-1 (SEIS)

("Change in Life Cycle GHG Emissions Relative to No Action" without carbon

capture and sequestration). However, compared to no additional fossil fuels, the

Project would increase global GHGs by up to 1,922 million metric tons of $CO_2$-

equivalent. DOE000152 at S-9, Table S-2 (SEIS) ("Change in Life Cycle GHG

Emissions Relative to No Action" without carbon capture and sequestration). The

Department would later clarify that both no action scenarios are "unlikely,"

DOE000162 at 24 (Order 3643-C), and that it cannot conclude either is "more

accurate." *Id.* at 41.

The SEIS also evaluated the non-climate impacts of upstream gas development the Project would induce, but did so without any site-specific information about planned development on the North Slope, including new pads, wells, access roads, and pipelines. DOE000152 at 2-26, 4.1-2, 4.21-1 (SEIS). The Department noted "no floodplain mapping exists for the North Slope," *id.* at 4.3-5, and the SEIS was completed without the benefit of any site-specific surveys of water resources, wetlands, or wildlife, *id.* at 4.3-4, 4.4-2, 4.6-2 to 4.6-3. Nevertheless, the SEIS concluded that impacts on most North Slope resource categories would be insignificant, assuming in most cases that mitigation measures would successfully reduce the impacts. *See, e.g.*, *id.* at 4.3-9 (water resources); *id.* at 4.4-6 (wetlands); *id* at 4.5-5 (vegetation); *id.* at 4.6-7 (wildlife resources); *id.* at 4.7-6 (aquatic resources); *id.* at 4.8-8 (threatened, endangered, and special status species).

In April 2023, the Department issued an order finding that the impacts the SEIS examined did not change the Department's previous conclusion that exporting the Project's gas to non-free trade agreement countries would be consistent with the public interest. DOE000162 at 21, 25 (Order 3643-C). The order stated that due to significant uncertainty about future energy markets and energy consumption patterns, "[the Department] cannot make a definitive conclusion about the magnitude of GHG emissions and resulting climate impacts

associate with the [Project]'s exports," but the Project's true impacts will likely fall somewhere between the SEIS's two "unlikely" GHG emissions extremes, *id.* at 24. Those extremes differ by as much as 2,196 million metric tons of GHGs, *see* DOE000152 at S-9, Table S-2 (SEIS), or approximately the emissions that would be released from burning 29 million tanker trucks of gasoline or 12 million railcars of coal.[8] The order, like the SEIS, took no position on whether there will ever be market demand for the Project's LNG. DOE000162 at 22, n.106 (Order 3643-C). The Department granted Center for Biological Diversity's intervention. *Id.* at 21.

Petitioners jointly requested rehearing, arguing that the SEIS and Order 3643-C violated the Gas Act and NEPA. DOE000171 (Request for Rehearing (May 15, 2023)). The Department denied rehearing, stating that its use of these two no action alternatives was reasonable and that it complied with NEPA's requirements for how agencies must address missing or incomplete information, in part by adding the second no action alternative. DOE000175 at 17-20, 22-23 (Order 3643-D). The Department also concluded that it could not examine any alternatives to the Project's exports, other than the two no action alternatives, because other alternatives would not give the applicant what it wanted even if they serve the public interest. *Id.* at 15. The Department rejected Petitioners' Gas Act arguments, stating that it "is not required to determine market need for the

---

[8] Ex. 3 at 22; *infra* fn.4.

approved exports or to assess project viability," and that the remaining Gas Act arguments are "beyond the scope of this proceeding or are reframings" of Petitioners' NEPA arguments. *Id.* at 44, 53. Petitioners timely petitioned for review in this Court, which consolidated the case with Sierra Club's earlier case.

## SUMMARY OF ARGUMENT

The Department's determination under the Gas Act that the Project is not inconsistent with the public interest was arbitrary and capricious. Despite recognizing the need to evaluate the harms to the climate and the North Slope from allowing Project exports, the Department's reapproval took an impermissibly skewed approach by discounting and ignoring the Project's harms while relying on the Project's benefits that may never occur. First, the Department inflated uncertainty regarding the Project's contribution to climate-changing GHG emissions and claimed that uncertainty prevented it from drawing conclusions about the Project's climate harms. Second, the Department ignored that the exact same uncertainties should prevent it from ascertaining the Project's economic and security benefits, and yet continued to conclude that those benefits confirm the Project is in the public interest. Third, the Department dismissed, and did not even weigh in its public interest determination, the harms upstream gas production will inflict on the North Slope based on the unsupported assumption that non-mandatory, unproven mitigation measures will eradicate those harms.

The Department's attempts to deflect Petitioners' Gas Act arguments are unavailing. Petitioners' Gas Act arguments are not merely NEPA arguments under a different label, nor are they beyond the scope of the rehearing proceeding that culminated in the Department's 2023 substantive decision under the Gas Act. The Department's errors under the Gas Act all relate to what the Department charged itself with reexamining when it granted rehearing: reconsidering whether the Project should be approved under the Gas Act once the Project's full set of harms, including previously-unexamined Project-wide GHG emissions and destruction on the North Slope from gas production, are weighed against its benefits. The Department's failure to evenly consider these impacts instead of contorting its review to recognize the Project's benefits while dismissing its harms violates the Gas Act.

The Department's environmental review of the Project also violated NEPA and the Administrative Procedure Act. The Department's no action alternative analysis merely described what it admitted are unrealistic best-case and worst-case scenarios for the Project's GHG impacts and did not provide a useful baseline for analysis. The Department also did not comply with NEPA's requirements for missing information in its analysis of upstream impacts and downstream GHG impacts. These errors prevent the SEIS from fulfilling its purpose of ensuring that the Department's substantive decisionmaking is environmentally informed.

## STANDING

Petitioners have standing to bring this case on behalf of their members who would be harmed by construction and operation of the Project and otherwise have standing to sue in their own right. *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). This lawsuit is germane to Petitioners' organizational missions, Ex. 5, ¶¶4-6, 10-11, 17-23, 25-28; Ex. 10, ¶¶5, 7-8, 11, and neither the claims asserted nor the relief requested require individual members to participate in this lawsuit.

Petitioners' members include individuals who recreate around Cook Inlet and enjoy watching birds and endangered Cook Inlet beluga whales there. Ex. 5, ¶24; Ex. 6, ¶¶5-8; Ex. 7 ¶¶4-8; Ex. 8, ¶¶20-21; Ex. 9, ¶¶5-6. Increased vessel traffic caused by the Project's export terminal will increase underwater noise, which may drive away whales, will permanently affect whale habitat, will increase the risk of vessel strikes to whales, DOE00093 at 4-514, Tbl. 4.8.1-6 (FERC EIS), and will increase the risk of a spill that could damage the marine environment, DOE00097 at 46, ¶119 (FERC Order). These impacts negatively affect Petitioners' members' ability to view wildlife in Cook Inlet. Ex. 6, ¶¶9-10; Ex.7, ¶¶9-11; Ex. 8, ¶22; Ex. 9, ¶6. Increased ship traffic may also affect a member's interest in protecting marine mammals such as killer whales and endangered North Pacific

right whales that live and migrate along the Pacific shipping route by putting these animals at greater risk of ship strikes, vessel noise, and spills. Ex. 8, ¶24.

Sierra Club member Dan Ritzman has regularly visited America's Arctic, and plans to return to this area to view wildlife and enjoy the wild character of the land. Ex. 10, ¶¶12-14, 16. The Project may disturb the Central Arctic caribou herd's habitat and create a barrier to its migration, DOE00093 at 4-310, Tbl. 4.6.1-6 (FERC EIS), increasing the likelihood that Mr. Ritzman may no longer be able to view caribou on future trips to the Arctic. Ex. 10, ¶14. The Project may also negatively impact air quality and visibility around the Arctic National Wildlife Refuge, DOE00093 at 4-943 (FERC EIS), detracting from Mr. Ritzman's aesthetic enjoyment of the area. Ex. 10, ¶17.

Mr. Ritzman and Center for Biological Diversity member Richard Steiner also enjoy recreating in Denali National Park and Preserve and intend to visit the Park in the future. Ex. 10, ¶15; Ex. 8, ¶¶15-17. The Project will negatively impact their enjoyment of the Park by increasing traffic, closing roads on the Parks Highway, closing the pedestrian bridge across the Nenana River at the Park headquarters and visitor center, creating an eyesore visible from the Park, disrupting the Park's tranquility, and decreasing opportunities to view wildlife such as Denali wolves. DOE00093 at 3-24 to 3-27 (FERC EIS); Ex. 10, ¶15; Ex. 8, ¶¶16, 18-19.

The Court can redress these injuries by vacating the Department's orders because the Project will not be built absent DOE's approval of export to non-free trade agreement countries. The Department was required to automatically approve export from the Project to free trade agreement countries. *See supra* p. 7. However, if that automatic approval was sufficient to ensure the Project's construction, the Department's SEIS would be superfluous. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 770 (2004) (holding that "where an agency has no ability to prevent a certain effect" it need not consider that effect in a NEPA analysis). It is not. Indeed, the Department's no action scenario "represent[s] the Project not moving forward because the Department did not authorize exports to non-[free trade agreement countries] or for other reasons." DOE000152, App. D at D-9 (SEIS).

At minimum, the Department's approval of exports to non-free trade agreement countries increases the amount of LNG likely to be exported, increasing Petitioners' harms that flow from shipping traffic and induced production. *See Sierra Club v. FERC*, 827 F.3d 59, 65-67 (D.C. Cir. 2016) (finding standing to challenge order increasing authorized LNG export volume because additional exports would increase shipping traffic). The entire 419.9 billion cubic feet volume of 2022 U.S. exports by vessel to free trade agreement countries—roughly 11

percent of the United States' total 2022 LNG exports[9]—pales in comparison to the

929 billion cubic feet/year of exports the Department approved for the Project,

DOE000107 at 40 (Order 3643-A). The Project will target Asian markets.

DOE000162 at 45 (Order 3643-C). In 2022, the United States exported 315.7

billion cubic feet to Asian free trade agreement countries (Singapore and South

Korea)—about 8 percent of 2022 U.S. LNG exports.[10] There is no evidence that

the free trade agreement export market, in Asia or elsewhere, could absorb the

"significant addition to global LNG supply," *id.* at 23, that the Project seeks to

export. The Department's approval of non-free trade agreement exports therefore

vastly expands the potential market for the Project's gas.

Basic economic principles also hold that increasing the potential customer

base, and thus demand, for exports increases the Project's likelihood of finding

profitable customers. *Competitive Enter. Inst. v. Fed. Commc'ns Comm'n*, 970

F.3d 372, 386-87 (D.C. Cir. 2020) (appellants proved causation by providing

"assessments [that] are 'firmly rooted in the basic laws of economics'" (quoting

*United Transp. Union v. Interstate Com. Comm'n*, 891 F2d 908, 912 n.7 (D.C. Cir.

---

[9] United States 2022 free trade agreement exports of 419.9 billion cubic feet/year (30.1 to Chile, 5.7 to Columbia, 50.8 to the Dominican Republic, 3.8 to Mexico, 13.8 to Panama, 23 to Singapore, and 292.7 to South Korea) were roughly 11 percent of the total 3,866 billion cubic feet/year exported. Ex. 11. Petitioners request the Court take judicial notice of this data. *See Cannon*, 717 F.3d at 205 n.2; Fed. R. Evid. 201.
[10] *See* Ex. 11 (23 to Singapore and 292.7 to South Korea).

1989))). Indeed, Alaska Gasline Development Corporation argued below that "any delay it encounters in 'obtaining final approvals' creates the potential for 'real and substantial' harm, as such delay will adversely affect [the corporation]'s ability to obtain needed customer and financing commitments for the . . . Project." DOE000162 at 12 (Order 3643-C) (quoting DOE000146 at 8 (Alaska Gasline Development Corporation, Opposition to Center for Biological Diversity Motion for Late Intervention); *see also id.* at 21.

In sum, Petitioners have standing because there is a "substantial probability" that the Department's non-free trade agreement export authorization will enable the Project's economic operation, or at least increase the Project's export volume, and thereby harm Petitioners' members. *In re Idaho Conservation League*, 811 F.3d 502, 508 (D.C. Cir. 2016).

## ARGUMENT

### I. Standard of review

This Court reviews the Department's compliance with NEPA and the Gas Act under the arbitrary and capricious standard, *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 196, 202 (D.C. Cir. 2017), and determines, in accordance with the Administrative Procedure Act, whether the Department has "examine[d] the relevant data" and made "a rational connection between the facts found and the

choices made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

## II. The Department's approval of the Project under the Gas Act was arbitrary and capricious.

The SEIS identified the potential for Project exports to cause tremendous increases in GHG emissions and associated climate harms, but in weighing those harms in its public interest analysis, the Department discounted them as "highly uncertain" and concluded that the Project's environmental harms were insufficient to outweigh evidence of its purported benefits. DOE000162 at 25 (Order 3643-C). The Department's conclusion rests on an irrationally inflated view of the uncertainty as to the Project's climate harms and an inconsistent, arbitrary treatment of the Project's harms and benefits. The Department ignored the fact that the purported benefits are just as uncertain as the climate harms, and that the two are linked. That is, to the extent that "uncertainties inherent in predicting future energy market behavior and energy consumption patterns around the world" prevented the Department from reaching more definitive conclusions about the Project's climate harms, *id.* at 24, those same uncertainties apply to whether and to what extent the Project's exports produce any benefits. For example, insofar as Project exports displace other U.S. exports, and, thus, would arguably not generate any GHG emissions that would not otherwise exist, they also would not provide any new nationwide economic or security benefits. On the other hand, for the

Project to create the economic and security benefits the Department relies upon to conclude that these exports are in the public interest, the Project's LNG must increase net exports and necessarily emit GHGs that would not otherwise exist. The Department's analysis, however, treats the Project's climate harms as too uncertain to consider and the Project's benefits as a given.

In addition, while the Department used uncertainty as a basis to downplay the Project's climate harms, it assumed that the many certain environmental harms that will result from gas development on the North Slope would be mitigated without any evidence that mitigation measures will be mandatory, feasible, or effective. *Id.* at 14-15.

The Department's decision to approve the Project's exports is arbitrary and capricious because it is skewed irrationally in favor of approval. While this Court has held that the Department may "find that the public interest weighs in favor of allowing the exports" despite significant environmental harms, *Sierra Club*, 867 F.3d at 203, the Department must still reach such a determination through a rational decisionmaking process—something it failed to do here.

### A. The Department's treatment of the Project's climate harms was arbitrary and capricious.

The Department's public interest determination was arbitrary because the Department overstated the degree of uncertainty regarding the Project's GHG emissions and relied on that inflated uncertainty to downplay and effectively

ignore the Project's climate harms, without acknowledging that the same uncertainty plagues the Project's asserted benefits. The Department claims that the lack of certainty as to the Project's GHG emissions is due to its inability to predict future international LNG market conditions, including future supply and demand responses. DOE000162 at 22 (Order 3643-C). This argument, however, fails for at least two reasons. First, the lack of clarity as to the Project's climate impacts is largely of the Department's own making. The Department insisted on comparing Project emissions to two extreme and unrealistic no action emissions scenarios—producing a uselessly expansive range of Project emissions from the lowest to highest possible—while ignoring available modeling that could drastically reduce the uncertainty. Second, the uncertainty the Department cites as a hurdle here—the difficulty in predicting future LNG market conditions—presents just as much of an obstacle to determining the extent of the Project's security and economic benefits. The Project cannot produce additional economic and security benefits to the United States if there is no demand for its gas or if it just substitutes for other sources of LNG. Yet, if the Project is serving a new demand and increasing net LNG exports, it will certainly produce GHG emissions that will count against United States totals. The Department states that it cannot evaluate the Project's climate harms, but that it can conclude that the Project will create substantial benefits. Because uncertainty about the global LNG market and substitution effects impacts both the

harms and benefits, this conclusion rests on the Department inconsistently treating

that uncertainty as a factor that diminishes the importance of the Project's climate

harms but does not undermine any of the Project's benefits. *See infra*, Section II.B.

The Department chose to frame its analysis of the Project's possible adverse

climate impacts by comparing the Project's GHG emissions to two extreme

scenarios. *See supra* pp. 9-10. In comparison to No Action Alternative 1, the

Department concluded the Project might avoid up to $37.5 billion in climate

harms, DOE000152 at 4.19-13 Tbl. 4.19-5 (SEIS) (Results comparison for Project

Scenario 3 without carbon capture and sequestration, "3%, 95th Perc" column, for

South Korea and China destinations), by substituting for LNG from other sources

that produce marginally higher associated emissions and that the Department

assumed would export in the Project's absence, DOE000162 at 23 (Order 3643-C).

In comparison to No Action Alternative 2, the Department assumed that the

Project's exports would be entirely additive, and the Project would add between

1.5 billion and almost 2 billion metric tons of GHGs into the atmosphere,

DOE000152 at S-9, Tbl. S-2 (SEIS) ("Change in Life Cycle GHG Emissions

Relative to No Action" for "End Use Power Generation without [Carbon Capture

and Sequestration]"), causing up to $249 billion in climate harms, *id.* at 4.19-14,

Tbl. 4.19-6 (Results comparison for Project Scenario 3 without carbon capture and

sequestration, "3%, 95th Perc" column, for India destination). The Department

states that due to significant uncertainty about future energy markets, it is "unable to conclude that either [scenario] . . . is more accurate," DOE000162 at 41 (Order 3643-C), but that the Project's true impacts fall somewhere between these two "unlikely" extremes, *id.* at 24. On this basis, the Department characterized the Project's climate impacts as "highly uncertain." *Id.* at 25.

The Department's insistence on using only these two extremes exacerbated the uncertainty it claims prevented it from assessing the Project's climate harms, as is clear from how "absolutely useless" the two figures are to the Department's public interest decision. *See National Ass'n of Regulatory Utility Comm'rs v. U.S. Dep't of Energy*, 736 F.3d 517, 519 (D.C. Cir. 2013) (rejecting the Department's attempts to avoid its statutory responsibility by claiming that the range of relevant data was too great). The $279 billion gap between the two scenarios is equivalent to shutting down 73 coal-fired power plants for a year, compared to running 514 new coal plants for a year.[11] The Department's refusal to narrow down such a monstrous range thwarted any rational determination that the requested export approval is not inconsistent with the public interest. *See id.*

---

[11] *See supra* pp. 9-10 (the range of emissions the Department projected is between -274 million metric tons and +1,922 million metric tons of $CO_2$-equivalent.); Ex. 3 at 7, 19 (power plant equivalencies for 274 million metric tons of $CO_2$-equivalent and 1,922 million metric tons of $CO_2$-equivalent); *supra* fn. 4.

As a result, not surprisingly, there is no statement in the SEIS or challenged orders that describes how the Department weighed the Project's climate harms against its benefits, nor could there be. Instead, the Department simultaneously claims that it cannot conclude that either no action alternative is more accurate, DOE000162 at 41 (Order 3643-C), and, without any apparent support, that "in [the Department]'s judgment the GHG emissions and related climate impacts associated with Alaska LNG's exports—at the very least, those in the near to medium years of the approximately 33-year export period—are likely to be closer to the difference between No Action Alternative 1 and the Project scenarios." *Id.* at 24-25. In other words, despite the SEIS providing no basis for selecting either extreme, or any point in between, and despite the Department asserting that it "cannot draw a definitive conclusion about the magnitude of climate impacts associated with Alaska LNG's exports," *id.* at 22, the Department vaguely asserts that the Project's climate impacts will be closer to the best-case scenario than the worst. However, it is not clear whether or to what extent the Department even used this closer-to-best-case guess in its ultimate approval of the Project as its final conclusion emphasizes the uncertainty of the Project's GHG emissions and does not reflect any view as to the significance of those emissions. *See id.* at 25. In fact, there is no way to tell from the Department's decision documents whether any amount of damage to the climate would have tipped the scales.

Moreover, the Department's use of these extremes was unnecessary. The Department could have significantly reduced the extent of the uncertainty it claims exists simply by making use of the information provided to it. The Department arbitrarily refused to use the data in the record—including information submitted by the applicants—that would have enabled it to better estimate the GHG emissions by establishing a realistic range for the Project's exports based on a reality-based estimate of how much the Project's exports would substitute for LNG produced elsewhere. Rather than meaningfully engage with this data, the Department attempted to dismiss the National Economic Research Associates (NERA) modeling submitted by applicants in support of the export application, DOE00028, App. F at 42 (AGDC, Export Application), and highlighted by Petitioners, *see, e.g.*, DOE000171 at 16-17 (Request for Rehearing (May 15, 2023) (citing DOE000463 at 7-8 (Sierra Club *et al.* Draft SEIS Comments)), claiming it is too old or too speculative to be useful. DOE000175 at 51 (Order 3643-D). That same NERA modeling, which shows that roughly two-thirds of the Project's exports would be not be offset by LNG export from other United States sources, however, is modeling the Department has relied on to analyze the economics of LNG exports in past proceedings.[12] In fact, the Department relied on *the same*

---

[12] *See, e.g.,* DOE000116 (*Epcilon LNG, LLC*, Dep't of Energy, Office of Fossil Energy and Carbon Mgmt. Order 4629).

nine-year old NERA modeling it now claims is outdated to find that this Project would create economic benefits. DOE000107 at 18-19, 30-31 (Order 3643-A). The Department, therefore, provided no rational basis for rejecting data that could substantially reduce the uncertainty it claims prevents it from meaningfully considering the Project's GHG emissions. The Department also did not explain why it could not use any other available forecasts if it did not want to rely on the NERA modeling. The Department's refusal to rely on the modeling, or to provide a rational explanation for why it could not, constitutes an arbitrary "fail[ure] to consider an important aspect of the problem." *See State Farm*, 463 U.S. at 43.

In addition to manufacturing greater uncertainty around climate harms, the Department also arbitrarily relied on that uncertainty to downplay and dismiss the climate harms in a manner that is completely inconsistent with its treatment of uncertainty in factors favoring approval of the Project. "[A]n internally inconsistent analysis is arbitrary and capricious." *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1141 (9th Cir. 2015) (citing *Gen. Chem. Corp. v. U.S.*, 817 F.2d 844, 857 (D.C.Cir.1987) (per curiam)). The Department cannot use uncertainty to discount only one side of the ledger when that same uncertainty exists on the other side. *Cf. Assn. of Oil Pipe Lines v. FERC*, 281 F.3d 239, 247 (D.C. Cir. 2002) (finding it arbitrary that, "having previously used changes in net plant for one purpose despite its imperfections, FERC turned around and relied on

those very imperfections to reject its use"); *LePage's 2000, Inc. v. Postal Regul. Comm'n*, 642 F.3d 225, 232 (D.C. Cir. 2011) ("The Commission does not explain how it can read the same evidence differently when applied to different aspects of the same program."). As is discussed in more detail in Section II.B, the Department downplayed and ignored the same uncertainties when weighing the Project's benefits—the unpredictable nature of international LNG markets—that it inflated and claimed stymied the analysis of climate harms. If the Department is unsure about the scale of the Project's climate harms because of uncertainties as to whether the Project will ever export LNG and the extent to which that LNG substitutes for LNG that would have been produced elsewhere, the Department should also be unsure about the scope of the Project's benefits. In reassessing whether the Project's exports were consistent with the public interest, the Department was obligated to treat each factor it was balancing in the same way when presented with the same uncertainty. The Department's failure to evenly treat the uncertainties on both sides of the balancing test is itself arbitrary and capricious.

Thus, by insisting on utilizing two extreme, unrealistic, and unhelpful market scenarios and ignoring data and tools that would have allowed it to shrink the range of likely outcomes, the Department manufactured unnecessary uncertainty in its evaluation of GHG emissions, and its arbitrary treatment of that

uncertainty allowed it to effectively ignore a huge portion of the Project's harms. "The mere fact that the magnitude of [an effect] is *uncertain* is no justification for *disregarding* the effect entirely." *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1219 (D.C. Cir. 2004) (emphasis in original)*; see also Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 549 (8th Cir. 2003) ("when the *nature* of the effect is reasonably foreseeable but its *extent* is not, we think that the agency may not simply ignore the effect") (emphasis original). While the Department claims that it "did not 'weight' [] climate impacts with any less consideration in terms of the broader public interest analysis," DOE000175 at 55 (Order 3643-D), it is clear from the sheer number of times that the Department emphasized the "uncertain" nature of the Project's climate impacts, DOE000162 at 13, 22-24, 25, 35, 38, 41 (Order 3643-C), that the Department's claimed inability to more definitively determine the extent of the Project's climate harms significantly impacted its ultimate decision to approve the Project under the Gas Act. The Department's order clearly provides that its decision rests on having weighed "the acknowledged but *highly uncertain* climate impacts against the economic and international security benefits of Alaska LNG's approved exports." *Id.* at 25 (emphasis added).

Moreover, the failure of the challenged orders to meaningfully grapple with any of the Project's GHG emissions demonstrates how little the emissions factored

into the Department's consideration of whether to approve the Project's exports.

For example, even if the Project's exports would substitute for use of foreign fossil

fuels, the Project would cause a substantial increase in upstream emissions from

new United States gas production. In one scenario, the SEIS's lifecycle analysis

estimates that emissions from "natural gas production, transport, and liquefaction,"

through 2061 could total 454 million metric tons of $CO_2$ equivalent. DOE000152,

App. C, Ex. 4-21 at 60-61 (SEIS) (scenario 2). Those emissions would count

against the United States' commitments to reduce its territorial GHG emissions

under the Paris and Copenhagen agreements.[13] Increasing domestic emissions is

also at cross purposes with the Administration's commitment to achieving a net

zero economy by 2050 and reducing GHG emissions to 50-52 percent below 2005

levels by 2030.[14] The Department's orders lack any acknowledgement of these

basic realities, further illustrating that the Department did not, in fact, consider the

Project's climate harms in its decision.

---

[13] DOE00018 (United Nations, *Framework Convention on Climate Change*);
DOE00075 (United Nations, Paris Agreement to the United Nations Framework
Convention on Climate Change).
[14] DOE000165 (The White House, *FACT SHEET: President Biden to Catalyze
Global Climate Action*); DOE000127 (The White House, *FACT SHEET: President
Biden Sets 2030 Greenhouse Gas Pollution Reduction Target*).

## B. The Department ignored uncertainties regarding the Project's benefits.

Uncertainty regarding international LNG markets and whether, and in what amount, the Project will ultimately export LNG affects the ability to estimate the extent of both the Project's benefits and harms. The Department, however, arbitrarily discounted only the harms on the basis of this uncertainty. Then, in reaffirming its determination that the Project would be consistent with the public interest, the Department relied almost exclusively on the wholly uncertain proposition that the Project would create economic and security benefits. *See* DOE000162 at 25 (Order 3643-C). These benefits will only manifest if the Project is ultimately constructed and commences operation and does not displace U.S.-produced LNG that would otherwise have come online. The Department has admitted that it takes no position on the likelihood that demand sufficient to prompt construction and operation will occur, *id.* at 22 n.106 (citing DOE000152 at S-7 (SEIS)), and thus has failed to address, let alone eliminate, the huge range of possibilities as to the Project's benefits. The Department's weighing of the Project's benefits arbitrarily ignored uncertainties that undermine those benefits— the same uncertainties the Department claimed rendered the Project's climate harms too speculative to outweigh the benefits.

It was arbitrary for the Department to rest a decision on a finding of benefits without also considering the likelihood that those benefits would materialize,

particularly while discounting the Project's harms for the exact same deficiencies. This Court recently held that the Surface Transportation Board could not ignore whether there would be market support for a railway intended to carry crude oil in its decisionmaking regarding the railway. *Eagle Cnty., Colo. v. Surface Transp. Bd.*, 82 F.4th 1152, 1193-94 (D.C. Cir. 2023). This Court noted that "a project that is in doubt of ever materializing or continuing to operate cannot accomplish any of the transportation merits identified by the Board." *Id.* at 1193. Similarly, here, a Project that never exports gas cannot achieve any of the economic or security benefits that the Department found render the Project in the public interest, and the Project would provide no "national economic benefits" or increase in "gross domestic product," DOE000162 at 25 (Order 3643-C) (citing DOE000107 at 30-31 (Order 3643-A)), if its exports merely substitute for exports from the lower 48 states that would otherwise occur.

The Department fails to excuse its arbitrariness by arguing that no statute, regulation, or other legal authority requires it to find market need in order to approve gas exports and that inquiring into market need would be "at odds with principles established in [the Department]'s 1984 Policy Guidelines that [it] continues to apply." DOE000175 at 50 (Order 3643-D). The Department misses the point: the problem with the Department's analysis is its inconsistent treatment of market need. It is arbitrary to, on the one hand, rely on inflated uncertainty as to

market need as a reason to dismiss harms while, on the other, downplay and ignore uncertainty as to market need when evaluating benefits. The Guidelines' directive that the Department should not "determine the price and other contract terms" for exported gas, DOE000107 at 11 (Order 3643-A) (quoting DOE001 (Department, *Imported Natural Gas Policy Guidelines and Order*), does not render any more rational the Department's choice to ignore market uncertainties that undermine the Project's benefits, but then contradictorily cite those same uncertainties as reasons to dismiss the Project's climate harms. Further, examining the extent of the evidence supporting market demand does not entail the Department determining the price or contract terms of gas exports in violation of the Policy Guidelines. Likewise, the Department would hardly create "regulatory impediments to a freely operating market," *id.*, by acknowledging the reality that the market cannot sustain an unlimited amount of U.S. LNG exports and that a project's benefits may, therefore, not materialize.

The Department's failure to give equal treatment to the uncertainties underlying the Project's benefits and the Project's climate harms is all the more arbitrary because it caused the Department to ignore the potential for the Project to sit unutilized or underutilized, causing extensive environmental harm without providing any of the purported benefits. Although FERC is the agency that evaluates the environmental impacts of LNG terminals themselves, the

Department's approval will induce construction of supporting infrastructure—tree felling and wetland conversion for gathering lines or access roads, for example, *see, e.g.*, DOE000152 at 4.4-2, 4.5-1 (SEIS)—in anticipation of a project that may never be fully constructed. Approving exports without any market need inquiry could result in harms to the environment, communities, and the public interest that are not counterbalanced by any public benefits. The Department asserts that Petitioners' arguments "concerning the practical impact" of its export authorization are "beyond the scope" of the rehearing proceeding, DOE000175 at 51 (Order 3643-D), but these arguments, along with Petitioners' other arguments raised on rehearing, relate directly to the Department's unequal weighing of the Project's supposed benefits against the full set of its harms—analyzed for the first time in the SEIS—to determine if approving the exports is consistent with the public interest. *See infra* Section II.D.

Compounding its arbitrary treatment of evidence on LNG market dynamics, the Department ignored evidence that highlighted the irrationality of its refusal to grapple with the uncertainties that infect its finding of Project benefits. Petitioners pointed to data sources the Department could use to assess market demand, including U.S. Energy Information Administration data on global LNG demand, and the NERA modeling submitted by applicants. DOE000463 at 7-8 (Sierra Club *et al.* Draft SEIS Comments); DOE000171 at 4-7, 16-17, 23 (Request for

Rehearing (May 15, 2023)). The Department refused to rely on any of this available information, arguing that the NERA modeling is too old to be useful and that the Energy Information Administration data is "new" and beyond the scope of its rehearing proceeding. DOE000175 at 49-51 (Order 3643-D). As discussed above, the Department cannot arbitrarily use the NERA modeling in some circumstances and not others. The Energy Information Administration data also is not beyond the scope because it is relevant to the new weighing of harms and benefits that the Department undertook as part of this proceeding.

The Department also ignored its own findings in its recent Policy Statement that it has already approved more LNG exports than the market can sustain. DOE000168 (Department, *Non-Free Trade Agreement Countries Export Commencement Deadlines Policy Statement*). The Department is incorrect that the Policy Statement, establishing that the Department will generally not grant extensions when approved exports do not begin by the deadline, is irrelevant here. DOE000175 at 50-51 (Order 3643-D). LNG is a fungible commodity: the same facts established in the Policy Statement that demonstrate weak market need for already-approved LNG exports also demonstrate weak market need for *any* further LNG exports from any project. The Department's finding in the Policy Statement, therefore, casts serious doubts on the likelihood that there is demand for the Project and that the Project's benefits will, therefore, ever materialize. The Department

cannot reasonably ignore those facts in asserting that the Project will produce benefits while using similar uncertainties to dismiss its harms.

As with the Department's unsupported assertion that it weighed the Project's climate harms, this Court should not accept the Department's conclusory assertion that it "acknowledges that there are uncertainties associated with Alaska LNG's exports on both sides of the public interest 'scale'" and that it "did not tip the scale towards economic benefits." *Id.* at 57. Regardless of what the Department now asserts, treating both sides of the scale equally would have resulted in one of two outcomes. Either the harms *and* the benefits are too uncertain to be determined, undermining substantial portions of the Department's conclusion that the Project is consistent with the public interest. Or, if the Department assumes that the Project will, in fact, export gas and produce economic and security benefits, it must also accept that the Project will cause substantial climate harms. The Department's attempts to use uncertainty to dismiss the Project's harms—while ignoring that the same uncertainty undermines its findings of the Project's benefits—are what impermissibly tipped the scale and undermined the Department's public interest finding.

### C. The Department relied on unsupported assumptions about mitigation to ignore the Project's environmental harms.

The Department put a further thumb on the scale in its review of the Project when it dismissed upstream development impacts on the North Slope that the SEIS

found would be significant—including cumulative impacts on permafrost degradation, cumulative impacts from the permanent loss of wetlands, and impacts on subsistence users of Kaktovik and Nuiqsut, DOE000162 at 14-15 (Order 3643-C); DOE000152 at 4.20-10 to 4.20-11, 4.14--2 to 4.14-6 (SEIS)—by assuming that those impacts will be reduced to an unspecified degree by mitigation and ignoring the high levels of uncertainty about whether those mitigation measures will be effective or even employed. These impacts would not occur without construction of the Project, which cannot occur without the Department's export approval. *See supra* pp. 17-19. The Department concluded that "if the Project were not constructed, it is unlikely that another project would be constructed to export natural gas from the North Slope as LNG." DOE000162 at 34 (Order 3643-C)*; see also* DOE000152 at 2-23 (SEIS). However, the Department recognized that none of the mitigation conditions it is assuming will be successful are incorporated into its orders and there is no guarantee that those conditions will be incorporated as binding conditions in the Project's other permits. DOE000162 at 14-15 (Order 3643-C). In addition, even if these mitigation measures were binding, the record provides no assurance they would be effective, let alone eliminate the harms caused by a massive increase in North Slope gas production. Mitigation will not eliminate permafrost and wetlands impacts, and forcing indigenous hunters to relocate is not a harm-free proposition. Nevertheless, the Department chose to

ignore the uncertainty as to the imposition or effectiveness of these mitigation measures and simply assumed the best-case scenario, in stark contrast to how it treated uncertainty when evaluating the Project's potential climate harms.

Despite the fact that those significant North Slope impacts constitute one of the two impact categories the Department reviewed for the first time in the SEIS, the Department's reaffirmed public interest finding did not take them into account. *See* DOE000162 at 3-4 (Order 3643-C) (citing DOE000126 at 15-18 (Order 3643-B)). Order 3643-C focused on "weighing the acknowledged but highly uncertain climate impacts against the economic and international security benefits of the Project's approved exports." DOE000162 at 25. It said nothing about weighing, as part of its public interest determination, the North Slope impacts that the SEIS found would be significant, effectively treating these impacts as if they will not happen. Without any basis in the record to demonstrate that mitigation measures will be mandated, let alone effective to the point of reducing severe harms from a huge increase in gas production on the North Slope to insignificant levels, it was arbitrary and capricious for the Department to ignore these uncertainties and ignore impacts to the North Slope in its public interest determination.

### D. Petitioners' Gas Act arguments are properly before this Court.

All the Gas Act arguments Petitioners raise are properly before this Court. The Gas Act requires that this Court hear only arguments that have been raised to

an agency in a rehearing request. *See* 15 U.S.C. § 717r(a), (b). Petitioners properly raise arguments that could not have been raised in Sierra Club's 2020 request for rehearing of Order 3643-A, DOE000109, but were raised in Petitioners' 2023 rehearing request challenging how the Department weighed, in Order 3643-C, the newly examined impacts against the Project's benefits to find that the Project is consistent with the public interest. DOE000171; *see Columbia Gas Transmission Corp. v. FERC*, 477 F.3d 739, 741-42 (D.C. Cir. 2007) ("when a party filing a petition for rehearing was not on notice of the rationale that FERC would adopt in the rehearing order, the party has a 'reasonable ground' for not having addressed that rationale in its petition"). When a subsequent order on rehearing "substantively 'modifies the result reached in the original order,'" rather than just marshaling new explanations for reaching the same decision, it is a "new order" for which petitioners may seek judicial review after petitioning the agency for rehearing. *See Fore River Residents Against the Compressor Station v. FERC*, 77 F.4th 882, 891-92 (D.C. Cir. 2023) (citing *S. Nat. Gas. Co. v. FERC*, 877 F.2d 1066, 1072-73 (D.C. Cir. 1989)). Order 3643-C makes a new substantive public interest determination and includes an amended record of decision made upon an expanded administrative record documenting a broader set of harms, DOE000162. Therefore, it constitutes a "new" order for which Petitioners properly sought rehearing in 2023. The Department's contention that many of Petitioners'

arguments are "beyond the scope" of the rehearing proceeding, DOE000175 at 53 (Order 3643-D), fails for two reasons. First, the Department cannot, by claiming that it granted rehearing for a limited purpose, limit Petitioners to a narrower set of issues than those allowed by the Gas Act's judicial review provision. Second, even if the Department could narrow the reviewable issues, it could not exclude the issues Petitioners' arguments address because the Department explicitly stated it was examining those issues when it granted rehearing.

Sierra Club's 2020 rehearing request focused on the Department's complete failure to evaluate upstream and downstream environmental impacts. Now that the Department *has* evaluated those impacts, Petitioners may properly raise for the first time arguments regarding the arbitrary manner in which the Department evaluated those harms and weighed them against the Project's claimed benefits to conclude that the Project is not inconsistent with the public interest. *See* DOE000162 at 25 (Order 3643-C) (describing the Department's decisionmaking as "weighing" harms and benefits); DOE000175 at 57 (Order 3643-D) (referring to benefits and harms as two "sides of the public interest 'scale'"). Petitioners' arguments regarding the Department's inconsistent treatment of harms and benefits and inadequate consideration of newly evaluated harms go to the heart of the rehearing proceeding, *i.e.*, DOE's review of whether the Project's newly evaluated environmental harms, when weighed against its supposed benefits, undermine the

Department's prior finding of the Project's consistency with the public interest. Because the Department had not previously evaluated these environmental harms at all, Petitioners were previously unable to raise arguments about the Department's inconsistent treatment of these harms as compared to the Project's supposed benefits. *See Columbia Gas Transmission Corp.*, 477 F.3d at 744 ("Because FERC first advanced the market power argument in the Rehearing Order, Columbia is not jurisdictionally barred from urging an objection here.").

Petitioners also could not have raised any earlier than their SEIS comments and 2023 rehearing request their arguments that the Department exaggerated the extent to which uncertainties in LNG markets made the Project's climate harms difficult to predict while ignoring how those same uncertainties undermine claims that the Project will produce benefits. The SEIS is the first place where the Department used lack of certainty in LNG markets as a basis for selecting its two extreme and unhelpful no action alternatives, and Order 3643-C was the first order in which the Department expressed its rationale that the "highly uncertain climate impacts" did not outweigh the Project's purported benefits. DOE000162 at 25. Similarly, Order 3643-C was the first order in which the Department stated that it "takes no position on whether there will . . . be market demand" for the LNG produced by the Alaska LNG Project, *id.* at 22 n.106 (citing DOE000152 at S-7

(SEIS)), while simultaneously assuming the existence of benefits that will occur only if that market demand occurs.

The Department's stated purpose for the rehearing proceeding was to make a new decision, either reaffirming or rescinding its initial finding of consistency with the public interest, based on a new weighing of the Project's benefits against the newly examined full set of harms. DOE000175 at 48-49 (Order 3643-D) ("for [the Department] to evaluate the environmental impacts presented in the Final SEIS to determine if they were 'sufficient to alter [the Department]'s determination under [Gas Act] section 3(a) that exports of LNG from the proposed Alaska LNG Project to non-[free trade agreement] countries are not inconsistent with the public interest, as set forth in [Order 3643-A].'") (quoting DOE000126 at 6 (Order 3643-B)); *see also* DOE000162 at 20 (Order 3643-C) (granting Center for Biological Diversity's intervention and finding that arguments in any rehearing request must "pertain[] to the environmental analysis presented in [the Department]'s Final SEIS and the related environmental findings in this Order and Amended Record of Decision."). Petitioners' arguments regarding the Department's arbitrary balancing of harms and benefits—simultaneously accepting uncertain benefits and dismissing equally uncertain harms—to reach that reaffirmed public interest determination fall squarely within that stated purpose. The Department's environmental findings in Order 3643-C included its determination that the Project's "uncertain" harms do

not render the Project inconsistent with the public interest, DOE000162 at 25 (Order 3643-C), and Petitioners properly argue that the Department reached this finding by arbitrarily dismissing environmental harms that are no more "uncertain" than the Project's supposed benefits.

In attempting to set aside the arguments Petitioners raised on rehearing under the Gas Act, the Department also entirely misconstrues the relationship of NEPA review to agencies' substantive decisionmaking by dismissing many of Petitioners' Gas Act arguments as "reframings" of NEPA arguments, DOE000175 at 53 (Order 3643-D). The Department's failure to appropriately analyze and consider the Project's adverse environmental impacts, including its climate change impacts, is not only a procedural violation of NEPA but also undermines the Department's substantive decisionmaking under Section 3 of the Gas Act regarding whether exports are consistent with the public interest. *See Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1331 (D.C. Cir. 2021) (finding that the fact that FERC's "NEPA analyses of the projects' impacts on climate change and environmental justice communities were deficient under the [Administrative Procedure Act]" meant that "[t]he Commission's determinations of public interest and convenience under the [Gas Act] were therefore deficient to the extent that they relied on its NEPA analyses of the projects' impacts on climate change and environmental justice communities."); *see also Eagle Cnty., Colo.*, 82

F.4th at 1194 (finding that "errors" in an EIS "infect[ed] the final determination as well" and noting that "[t]he Board was required not only to identify [environmental] effects under NEPA . . . , but also to weigh them in its [substantive] analysis."). The Council on Environmental Quality has confirmed the importance of NEPA review to agencies' substantive decisionmaking in the preamble to its recent proposal to amend its NEPA regulations: "Congress established the NEPA process to provide for better informed Federal decision making and improve environmental outcomes, and those goals are not fulfilled if the NEPA analysis is treated merely as a check-the-box exercise." 88 Fed. Reg. 49,924, 49,930 (July 31, 2023). Petitioners' arguments that the SEIS's deficiencies infect the Department's substantive decisionmaking in Order 3643-C are therefore firmly within the scope of the rehearing proceeding which the Department initiated in order to further analyze environmental impacts and determine if that analysis changed its substantive Gas Act decisionmaking.

## III.   The Department's environmental review of the Project violated NEPA.

The Department's review of the Project's environmental impacts, through adoption of FERC's EIS and preparation of the SEIS, fell short of NEPA's requirements because: (1) the Department did not examine a realistic no action alternative, leaving it without a baseline against which to rationally compare the Project's impacts; and (2) the SEIS's discussion of downstream GHG emissions

and North Slope impacts did not comply with regulations regarding the treatment

of missing information in NEPA reviews.

### A. The Department failed to identify even a remotely realistic no action alternative, rendering its analysis of climate impacts meaningless.

The Department failed to evaluate any realistic no action alternative. *See*

*supra* pp. 9-10. Instead, the agency merely identified the extreme outer bounds of

possible outcomes, from a seriously harmful climate impact on the one hand to a

slightly positive impact on the other. The Department's use of these two

unrealistic, best- and worst-case scenarios violated NEPA because it failed to

produce information capable of meaningfully informing the agency's substantive

decisionmaking and ignored the existence of modeling that could have allowed the

Department to identify a narrower, realistic range of no action alternatives. *See*

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989) (explaining that NEPA

is intended to produce information that will meaningfully inform agency's

substantive decisionmaking); *Balt. Gas & Elec. Co. v. Natural Res. Defense*

*Council*, 462 U.S. 87, 97 (1983) (identifying the facilitation of informed agency

decisionmaking and public involvement as NEPA's "twin aims"). Additionally, the

Department acted arbitrarily because, of the two bookend scenarios on which the

Department relies, the scenario the Department views as more likely assumes

perfect substitution of the Project's LNG for other sources of LNG—an

assumption courts have repeatedly rejected as inconsistent with basic economic principles.

An EIS must analyze a no action alternative—the world as it would be if the agency did not take the proposed action. 40 C.F.R. § 1502.14(c); 46 Fed. Reg. at 18,027 (Question 3). The no action alternative provides a critical baseline without which agencies cannot meaningfully assess a project's environmental impacts. *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 642 (9th Cir. 2010) (quoting *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998)). Furthermore, if an agency has discretion to deny a proposed project, it must at least consider the no action alternative as a possible outcome. *Cf. Anglers of the Au Sable v. U.S. Forest Serv.*, 565 F. Supp. 2d 812, 816, 834-36 (E.D. Mich. 2008) (holding that Forest Service arbitrarily and capriciously failed to take a hard look at no action alternative when it "mistakenly considered itself obligated by both policy and by the terms of [an existing] lease to adopt an action alternative").

Here, because the trajectory of the energy market determines the resulting climate impacts and the Department claims to be wholly unable to predict that trajectory, the Department's no action alternatives do not provide the critical baseline against which to measure the Project's impacts. The SEIS merely identifies two theoretical opposite extremes and states that a realistic no action

scenario would likely fall somewhere between the two. However, the two scenarios are so different that the agency cannot even discern whether the project would increase or decrease harmful GHG emissions, rendering it useless in the Department's decisionmaking. *See Nat'l Ass'n of Regulatory Utility Comm'rs*, 736 F.3d at 519 (rejecting DOE's similar invocation of a range of possibilities "so large as to be absolutely useless" in fulfilling its obligations under the Nuclear Waste Policy Act).

Despite admitting both alternatives are unlikely, *see supra* p. 10, the Department asserts that its two no action alternatives "together more fully informed [the Department]'s decision by capturing and disclosing for decisionmakers and the public the full breadth of potential impacts that could result from the denial of an authorization for exports from the Alaska LNG Project." DOE000175 at 20 (Order 3643-D). But the Department does not, and cannot, explain how noting the full breadth of theoretically possible climate impacts is more informative than attempting to predict the Project's likely impacts. To the contrary, as the U.S. Environmental Protection Agency (EPA) noted with concern, the Department's use of two no action alternatives only "adds complexity for decision makers and the public in understanding the analysis presented in the Final SEIS, as well as the NEPA decision-making process." DOE000162 at 41 (Order 3643-C) (paraphrasing EPA comments on final SEIS).

NEPA does not require the Department to do the impossible, but the Department cannot simply claim that it is unable to narrow the range of possible outcomes while failing to either use, or rationally explain its failure to use, available data that it could have relied on to do so. *See supra* pp. 26-27. NEPA regulations spell out agencies' obligations when information necessary to evaluate a project's impacts is missing or unavailable, 40 C.F.R. § 1502.21, and the Department failed to comply with those regulations. *See infra* pp. 52-56. Moreover, as discussed above, *supra* Section II.A, the Department ignored data that could have helped it narrow the range of outcomes and provided no rational basis for failing to use modeling submitted by the applicant, which the Department relied upon to establish the Project's benefits, to estimate a narrower range of alternatives. The Department's refusal to rely on the modeling to evaluate a no action alternative while asserting that it could not possibly narrow the range of no action alternatives to better inform its decisionmaking and the public violates NEPA, as well as the Administrative Procedure Act.

Contrary to the Department's suggestion in its rehearing order, DOE000175 (Order 3643-D) at 19 & n.111, the Court did not hold in *Ctr. for Biological Diversity v. FERC*, 67 F.4th at 1182, that an agency may reasonably decline to evaluate a realistic no action alternative. Unlike the Department, the Commission in that case analyzed what it viewed as the likely no action alternative. *Id*. The

Court upheld that analysis. *Id.; see also id.* (holding that FERC reasonably "consider[ed] the reality of economic and development opportunities" in concluding that something like this project will likely be built even if this project is not approved). Incidentally, the Department does not share FERC's view that the no action alternative FERC used to evaluate the terminal's environmental harms reflects reality. DOE000162 at 34 (Order 3643-C) (explaining that the Department rejects FERC's conclusion due to the project's remote location and high costs). Nothing in the Court's holding in *Center for Biological Diversity* justifies the Department's refusal to use a realistic no action alternative.

Additionally, the Department's use of No Action Alternative 1 violates NEPA by assuming that other LNG would perfectly substitute for the Project's gas exports in the absence of the Department's approval. DOE000152 at 2-23 to 2-24 (SEIS); *id.* at 4.19-2. Courts have repeatedly, and categorically, rejected agency reliance on perfect substitution to conclude that permitting a project will result in no or minimal GHG emissions. Perfect substitution "contradict[s] basic economic principles," *WildEarth Guardians v. Bureau of Land Mgmt.*, 870 F.3d 1222, 1237-38 (10th Cir. 2017), is "illogical," and "places the [agency's] thumb on the scale by inflating the benefits of the action while minimizing its impacts," *Mont. Env't Info. Ctr. v. U.S. Office of Surface Mining*, 274 F. Supp. 3d 1074, 1098 (D. Mont. 2017), *amended in part on other grounds*, 2017 WL 5047901, No. CV 15-106-M-DWM

(D. Mont. Nov. 3, 2017); *see also High Country Conservation Advocs. v. U.S. Forest Service*, 52 F. Supp. 3d 1174, 1197-98 (D. Colo. 2014) (noting that additional supply impacts demand, meaning fuels that would otherwise not be extracted will be burned).

The Department's addition of No Action Alternative 2 in the final SEIS in response to Petitioners' and EPA's comments that the Department's draft SEIS improperly assumed perfect substitution, does not cure its use of No Action Alternative 1. *See* DOE000463 at 8-10 (Sierra Club *et al.* Draft SEIS Comments); DOE000152, App. D at D-86 to D-87, D-89 (SEIS). Even after it added No Action Alternative 2, the Department continued to rely on No Action Alternative 1, acknowledging that both scenarios informed its decision. DOE000175 at 20 (Order 3643-D). Despite the Department's statements that it did not select one of the scenarios as more likely than the other, it stated without explanation that the Project's GHG impacts would be "closer" to the difference between the Project scenarios and No Action Alternative 1 (which assumes perfect substitution), than that between the Project and No Action Alternative 2 (which assumes no substitution). DOE000162 at 24-25 (Order 3643-C). There is no indication that the Department would have reached the same public interest determination if it believed that Alternative 2 was the more realistic no action alternative. Thus, the Department accorded No Action Alternative 1 significant weight, tainting its

decisionmaking with the irrational perfect substitution assumption underlying that alternative.

The Department also does not cure this error by stating that "[t]he actual market substitution effects are unknown and could be met by non-LNG sources," DOE000175 at 20, (Order 3643-D) (quoting DOE000152, App. C at 2 (SEIS)). Whether the Department wrongly assumed perfect substitution was realistic or merely posited it for analytical purposes, the practical effect was the same: the Department gave undue weight to an alternative that reflects perfect substitution, which courts have roundly denounced as an inappropriate means of downplaying emissions.

The Department argues that assuming equivalent energy use in both Project and no action scenarios is consistent with the International Standards Organization's guidelines for preparing lifecycle analyses, *id*. at 19-20, but that is not relevant. The question here is not what constitutes a proper lifecycle analysis; the question is what analyses and inputs are necessary to inform a rational, NEPA-compliant analysis of the Project in comparison to a no action alternative. EPA suggested that that the Department could permissibly rely on Alternative 1 to form the basis of the lifecycle analysis's substitution analysis that allows for comparison amongst various project scenarios, but that the Department should rely on Alternative 2 for NEPA's required comparison of project scenarios to a no action

alternative. DOE000162 at 41 (Order 3643-C). Instead, the Department continued to rely significantly No Action Alternative 1, impermissibly downplaying the Project's emissions.

In sum, the Department both arbitrarily failed to identify any realistic no action alternative and relied significantly upon an arbitrary no action alternative, violating NEPA and the Administrative Procedure Act and providing no baseline against which to assess the Project's emissions.

### B. The SEIS does not comply with NEPA regulations regarding missing information.

The Department violated NEPA regulations on missing information by: (1) refusing either to use available modeling to identify a narrower, realistic range of no action alternatives, or to rationally explain why it could not do so; and (2) failing to adequately examine North Slope impacts. The SEIS fell short of the requirement that when "information relevant to reasonably foreseeable significant adverse impacts" cannot be obtained, an EIS must include: "a statement that such information is incomplete or unavailable"; a statement of the relevance of that information to evaluating the project's reasonably foreseeable impacts; a summary of existing credible scientific evidence relevant to evaluating those impacts; and the "agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community." 40 C.F.R. § 1502.21.

In maintaining that the trajectory of the energy market is so uncertain that the Department cannot even determine if the Project would benefit or harm the climate, the Department did not even consider the option of using the NERA modeling submitted by the applicant to formulate a more realistic no action alternative between the two unlikely bookend alternatives. As is discussed above, the Department has provided no rational justification for its failure to use the NERA modeling when it specifically relied on that modeling in finding that the Project has economic benefits, DOE000107 at 18-19, 30-31 (Order 3643-A), and to analyze the economic benefits of exports in other proceedings, *see, e.g.*, DOE000116 (*Epcilon LNG, LLC*, Dep't of Energy, Office of Fossil Energy and Carbon Mgmt. Order 4629). In light of its past and present reliance on NERA modeling, the Department cannot plausibly claim NERA modeling is not credible, relevant evidence or a "theoretical approach[] or research method[] generally accepted in the scientific community." 40 C.F.R. § 1502.21(c)(4).

The Department's argument in the rehearing order that it need not even consider the relevance of the NERA modeling unless Petitioners can prove that modeling "would mitigate this uncertainty and provide a more realistic no action scenario," DOE000175 at 19 (Order 3643-D), misconstrues its NEPA obligations. The record shows that the Department considers the NERA modeling credible and reliable enough to rely on in related contexts, and it is directly relevant to the

uncertainty that the Department asserts here. On these facts, the Department had an affirmative obligation to summarize what evidence the NERA modeling provides and at least explain why the Department chose to discount that evidence in favor of what it admits are unrealistic hypotheticals. 40 C.F.R. § 1502.21; *State Farm*, 463 U.S. at 43 (holding that in order for court to uphold agency action under arbitrary and capricious standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Instead, the Department arbitrarily ignored both the applicant's NERA modeling and the option of using similar, but more updated, modeling to project market demand for the purposes of analyzing the Project's realistic GHG emissions. For example, EPA noted in its comments on the SEIS that "[a]vailable models include the Bureau of Ocean Energy Management's Revised Market Simulation Model, the U.S. Energy Information Administration's National Energy Modeling System, and ICF International's Integrated Planning Model." DOE000496 at 4 n.5 (EPA SEIS comments). The Department never even attempted to use these resources or explain why it did not.

The Department also failed to comply with the missing information regulation in its analysis of North Slope impacts. The SEIS takes the first step regulations require when information is incomplete or unavailable—disclosing the

lack of specific information about planned North Slope upstream development, including new pads, wells, access roads, and pipelines. DOE000152 at 4.21-1 (SEIS); *see also, e.g., id.* at 4.1-2, 4.3-4. However, it does not adequately discuss this information's relevance to the Department's decisionmaking, nor does it provide the Department's evaluation of these impacts based on theoretical approaches or generally accepted research methods. *See* 40 C.F.R. § 1502.21(c)(4). The SEIS does not adequately explain how the Department was able, absent floodplain maps for the North Slope, DOE000152 at 4.3-5 (SEIS), or site-specific surveys of water resources, wetlands, or wildlife, *id.* at 4.3-4, 4.4-2, 4.6-2 to 4.6-3, to evaluate the significance of upstream development impacts or to rationally weigh these adverse impacts against the Project's supposed benefits. Upstream impacts to the North Slope comprise one of the two categories of impacts the Department reviewed for the first time in the SEIS, *see supra* p. 9, yet the SEIS does not contain adequate analysis of these impacts to support reasoned decisionmaking, and the Department's order reaffirming its public interest determination summarily dismisses those impacts. DOE000162 at 14-15, 50 (Order 3643-C).

Together, the Department's failure to adequately address missing information about the realistic no action alternative from a climate perspective and about environmental impacts to the North Slope prevented the Department from

meaningfully fulfilling either of its aims in granting Petitioner Sierra Club's request for rehearing. *See supra* p. 9 (describing the Department's goals). The Department's SEIS leaves the agency largely uninformed about both categories of impact, thwarting NEPA's goal of informed decisionmaking and undermining the Department's public interest analysis under the Gas Act.

**IV.   This Court should vacate and remand the Department's orders granting export approval.**

Vacatur is the ordinary remedy when agency action is found to be arbitrary and capricious. *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (citing 5 U.S.C. § 706(2)). This case does not present any reason to depart from that standard practice.

"The decision whether to vacate depends on 'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'" *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (quoting *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 967 (D.C. Cir. 1990)). As discussed above, both the Department's NEPA analysis and its Gas Act decisionmaking are pervaded by flaws serious enough to cause doubt that the Department would reach the same outcome if it were to perform a lawful decisionmaking process. "[W]here an agency's NEPA review suffers from 'a significant deficiency,' refusing to vacate

the corresponding agency action would 'vitiate' the statute." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1052 (D.C. Cir. 2021), *cert. denied sub nom. Dakota Access, LLC v. Standing Rock Sioux Tribe*, 142 S. Ct. 1187, 212 L. Ed. 2d 54 (2022) (quoting *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 536 (D.C. Cir. 2018)). Analyzing the second factor "requires consideration of 'both the disruptive consequences to the [relevant] industry, as well as the potential environmental damage that might continue unabated while [the agency] revisits its determinations." *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1049 (10th Cir. 2023) (quoting *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015)). Although export of LNG to non-free trade agreement countries from the Alaska LNG terminal cannot occur without the Department's authorization, there is no evidence that it would be unduly disruptive for the Department's approval to be vacated if, with proper NEPA analysis and after further consideration under the Gas Act, it is later reissued. Construction has not begun and will take years to complete before any exports can occur. While the Project proponent may argue that vacatur might stall its ability to secure customers and financing, that temporary disruption is more than offset by the improvements to the Department's review on remand. *See Standing Rock*, 985 F.3d at 1053; *Realty Income Tr. v. Eckerd*, 564 F.2d 447, 456 (D.C. Cir. 1977) ("'The substantial

additional costs which would be caused by court-ordered delay' may well be justified by the compelling public interest in the enforcement of NEPA." (quoting *Steubing v. Brinegar*, 511 F.2d 489, 497 (2nd Cir. 1975).

## CONCLUSION

For the reasons stated above, Petitioners respectfully request that this Court vacate and remand the Department's orders granting approval for the Alaska LNG Project to export to non-free trade agreement countries.

Respectfully submitted this 15th day of December, 2023,

*s/ Erin Colón*
Erin Colón
EARTHJUSTICE
441 W 5th Avenue Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: ecolon@earthjustice.org

*s/ Moneen Nasmith*
Moneen Nasmith
EARTHJUSTICE
48 Wall Street, 15th Floor
New York, NY 10005-2903
T: 212.845.7376
E: mnasmith@earthjustice.org

*s/ Ann Jaworski*

Ann Jaworski
EARTHJUSTICE
311 S. Wacker Dr., Suite 1400
Chicago, IL 60606
T: 773.245.0837
E: ajaworski@earthjustice.org

*Attorneys for Petitioner Center for Biological Diversity*

*s/ Jason C. Rylander*

Jason C. Rylander
CENTER FOR BIOLOGICAL DIVERSITY
1411 K St. NW, Suite 1300
Washington, D.C. 20005
T: 202.744.2244
E: jrylander@biologicaldiversity.org

*Attorney for Petitioner Center for Biological Diversity*

*s/ Nathan Matthews*

Nathan Matthews
SIERRA CLUB
2101 Webster Street, Suite 1300
Oakland, CA 94612
T: 415.977.5695
E: nathan.matthews@sierraclub.org

*Attorney for Petitioner Sierra Club*

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Fed. R. App. P.

32(a)(7)(B) because it contains 12,928 words, excluding the parts of the document

exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has

been prepared in a proportionally spaced typeface using Microsoft Word 365 in

14-point Times New Roman.

Respectfully submitted this 15th day of December, 2023.

*s/ Erin Colón*
Erin Colón
EARTHJUSTICE

**CERTIFICATE OF SERVICE**

I hereby certify that on September 20, 2023, I electronically filed the

foregoing PETITIONERS' OPENING BRIEF, with exhibits, with the Clerk of the

Court for the United States Court of Appeals for the District of Columbia Circuit

using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by

the appellate CM/ECF system.

Respectfully submitted this 15th day of December, 2023.

*s/ Erin Colón*
Erin Colón
EARTHJUSTICE

**TABLE OF EXHIBITS**

| Exhibit No. | Description |
|---|---|
| 1 | U.S. Department of Energy, *Long Term Applications Received by DOE to Export Domestically Produced LNG, CNG, CGL from the Lower-48 States (as of October 11, 2023)*, https://www.energy.gov/sites/default/files/2023-10/Summary%20of%20LNG%20Export%20Applications_10.11.23.pdf |
| 2 | Federal Energy Regulatory Commission, *U.S. LNG Export Terminals – Existing, Approved not Yet Built, and Proposed* (Nov. 29, 2023), https://cms.ferc.gov/media/us-lng-export-terminals-existing-approved-not-yet-built-and-proposed |
| 3 | U.S. Environmental Protection Agency, Greenhouse Gas Equivalencies Calculator, https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator |
| 4 | U.S. Energy Information Administration, Natural Gas Annual, Overview – Table 1, Summary statistics for natural gas in the United States, 2018-2022 (2022), https://www.eia.gov/naturalgas/annual/pdf/table_001.pdf44 |
| 5 | Declaration of Brendan Cummings |
| 6 | Declaration of Cooper Freeman |
| 7 | Declaration of Terry Pauls |
| 8 | Declaration of Richard G. Steiner |
| 9 | Declaration of Andrea Feniger |
| 10 | Declaration of Daniel Ritzman |
| 11 | U.S. Energy Information Administration, *U.S. Natural Gas Exports and Re-Exports by Country*, https://www.eia.gov/dnav/ng/ng_move_expc_s1_a.htm |

[Color Page in Printed Brief]

**ADDENDUM**

| STATUTES | Pages(s) |
| --- | --- |
| 5 U.S.C. § 706(2) | A-1 |
| 15 U.S.C. § 717b | A-2 to A-5 |
| 15 U.S.C. § 717r(a) | A-6 |
| 15 U.S.C. § 717r(b) | A-6 to A-7 |
| 42 U.S.C. § 4332(2)(C) (2022) | A-8 to A-9 |

| REGULATIONS | |
| --- | --- |
| 10 C.F.R. § 1021.103 | A-10 |
| 40 C.F.R. § 1502.14 | A-11 |
| 40 C.F.R. § 1502.16(a) | A-12 to A-13 |
| 40 C.F.R. § 1502.21 | A-14 |
| 40 C.F.R. § 1508.1(g) | A-15 |

| RULES | |
| --- | --- |
| Fed. R. Evid. 201 | A-16 |

## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

. . .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

15 U.S.C.A. § 717b

§ 717b. Exportation or importation of natural gas; LNG terminals

Effective: August 8, 2005

(a) Mandatory authorization order

After six months from June 21, 1938, no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application, unless, after opportunity for hearing, it finds that the proposed exportation or importation will not be consistent with the public interest. The Commission may by its order grant such application, in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing, and for good cause shown, make such supplemental order in the premises as it may find necessary or appropriate.

(b) Free trade agreements

With respect to natural gas which is imported into the United States from a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, and with respect to liquefied natural gas--

(1) the importation of such natural gas shall be treated as a "first sale" within the meaning of section 3301(21) of this title; and

(2) the Commission shall not, on the basis of national origin, treat any such imported natural gas on an unjust, unreasonable, unduly discriminatory, or preferential basis.

(c) Expedited application and approval process

For purposes of subsection (a), the importation of the natural gas referred to in subsection (b), or the exportation of natural gas to a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, shall be deemed to be consistent with the public interest, and applications for such importation or exportation shall be granted without modification or delay.

(d) Construction with other laws

Except as specifically provided in this chapter, nothing in this chapter affects the rights of States under--

(1) the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.);

(2) the Clean Air Act (42 U.S.C. 7401 et seq.); or

(3) the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.).

(e) LNG terminals

(1) The Commission shall have the exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal. Except as specifically provided in this chapter, nothing in this chapter is intended to affect otherwise applicable law related to any Federal agency's authorities or responsibilities related to LNG terminals.

(2) Upon the filing of any application to site, construct, expand, or operate an LNG terminal, the Commission shall--

(A) set the matter for hearing;

(B) give reasonable notice of the hearing to all interested persons, including the State commission of the State in which the LNG terminal is located and, if not the same, the Governor-appointed State agency described in section 717b-1 of this title;

(C) decide the matter in accordance with this subsection; and

(D) issue or deny the appropriate order accordingly.

(3)(A) Except as provided in subparagraph (B), the Commission may approve an application described in paragraph (2), in whole or part, with such modifications and upon such terms and conditions as the Commission find[1] necessary or appropriate.

(B) Before January 1, 2015, the Commission shall not--

(i) deny an application solely on the basis that the applicant proposes to use the LNG terminal exclusively or partially for gas that the applicant or an affiliate of the applicant will supply to the facility; or

(ii) condition an order on--

(I) a requirement that the LNG terminal offer service to customers other than the applicant, or any affiliate of the applicant, securing the order;

(II) any regulation of the rates, charges, terms, or conditions of service of the LNG terminal; or

(III) a requirement to file with the Commission schedules or contracts related to the rates, charges, terms, or conditions of service of the LNG terminal.

(C) Subparagraph (B) shall cease to have effect on January 1, 2030.

(4) An order issued for an LNG terminal that also offers service to customers on an open access basis shall not result in subsidization of expansion capacity by existing customers, degradation of service to existing customers, or undue discrimination against existing customers as to their terms or conditions of service at the facility, as all of those terms are defined by the Commission.

(f) Military installations

(1) In this subsection, the term "military installation"--

(A) means a base, camp, post, range, station, yard, center, or homeport facility for any ship or other activity under the jurisdiction of the Department of Defense, including any leased facility, that is located within a State, the District of Columbia, or any territory of the United States; and

(B) does not include any facility used primarily for civil works, rivers and harbors projects, or flood control projects, as determined by the Secretary of Defense.

(2) The Commission shall enter into a memorandum of understanding with the Secretary of Defense for the purpose of ensuring that the Commission coordinate and consult[2] with the Secretary of Defense on the siting, construction, expansion, or operation of liquefied natural gas facilities that may affect an active military installation.

(3) The Commission shall obtain the concurrence of the Secretary of Defense before authorizing the siting, construction, expansion, or operation of liquefied natural gas facilities affecting the training or activities of an active military installation.

## Footnotes

[1]     So in original. Probably should be "finds".

[2]     So in original. Probably should be "coordinates and consults".

15 U.S.C.A. § 717r

§ 717r. Rehearing and review

Effective: August 8, 2005

(a) Application for rehearing; time

Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

(b) Review of Commission order

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of Title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection

shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which is supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28.

. . . .

§ 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall--

. . .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

. . . .

10 C.F.R. § 1021.103

§ 1021.103 Adoption of CEQ NEPA regulations.

DOE adopts the regulations for implementing NEPA published by CEQ at 40 CFR parts 1500 through 1508.

40 C.F.R. § 1502.14

§ 1502.14 Alternatives including the proposed action.

Effective: September 14, 2020

The alternatives section should present the environmental impacts of the proposed action and the alternatives in comparative form based on the information and analysis presented in the sections on the affected environment (§ 1502.15) and the environmental consequences (§ 1502.16). In this section, agencies shall:

(a) Evaluate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination.

. . .

(c) Include the no action alternative.

. . . .

# 40 C.F.R. § 1502.16

## § 1502.16 Environmental consequences.

### Effective: September 14, 2020

(a) The environmental consequences section forms the scientific and analytic basis for the comparisons under § 1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA that are within the scope of the statement and as much of section 102(2)(C)(iii) of NEPA as is necessary to support the comparisons. This section should not duplicate discussions in § 1502.14. The discussion shall include:

(1) The environmental impacts of the proposed action and reasonable alternatives to the proposed action and the significance of those impacts. The comparison of the proposed action and reasonable alternatives shall be based on this discussion of the impacts.

(2) Any adverse environmental effects that cannot be avoided should the proposal be implemented.

(3) The relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity.

(4) Any irreversible or irretrievable commitments of resources that would be involved in the proposal should it be implemented.

(5) Possible conflicts between the proposed action and the objectives of Federal, regional, State, Tribal, and local land use plans, policies and controls for the area concerned. (§ 1506.2(d) of this chapter)

(6) Energy requirements and conservation potential of various alternatives and mitigation measures.

(7) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

(8) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(9) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(e)).

(10) Where applicable, economic and technical considerations, including the economic benefits of the proposed action.

. . . .

40 C.F.R. § 1502.21

§ 1502.21 Incomplete or unavailable information.

Effective: September 14, 2020

(a) When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement, and there is incomplete or unavailable information, the agency shall make clear that such information is lacking.

(b) If the incomplete but available information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives, and the overall costs of obtaining it are not unreasonable, the agency shall include the information in the environmental impact statement.

(c) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are unreasonable or the means to obtain it are not known, the agency shall include within the environmental impact statement:

   (1) A statement that such information is incomplete or unavailable;

   (2) A statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment;

   (3) A summary of existing credible scientific evidence that is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment; and

   (4) The agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community.

(d) For the purposes of this section, "reasonably foreseeable" includes impacts that have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

40 C.F.R. § 1508.1

§ 1508.1 Definitions.

Effective: May 20, 2022

The following definitions apply to the regulations in this subchapter. Federal agencies shall use these terms uniformly throughout the Federal Government.

. . .

(g) Effects or impacts means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and include the following:

(1) Direct effects, which are caused by the action and occur at the same time and place.

(2) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

(3) Cumulative effects, which are effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non–Federal) or person undertakes such other actions. Cumulative effects can result from individually minor but collectively significant actions taking place over a period of time.

(4) Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effects will be beneficial.

. . . .

# Federal Rules of Evidence Rule 201, 28 U.S.C.A.

## Rule 201. Judicial Notice of Adjudicative Facts

(a) Scope. This rule governs judicial notice of an adjudicative fact only, not a legislative fact.

(b) Kinds of Facts That May Be Judicially Noticed. The court may judicially notice a fact that is not subject to reasonable dispute because it:

   (1) is generally known within the trial court's territorial jurisdiction; or

   (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

(c) Taking Notice. The court:

   (1) may take judicial notice on its own; or

   (2) must take judicial notice if a party requests it and the court is supplied with the necessary information.

(d) Timing. The court may take judicial notice at any stage of the proceeding.

(e) Opportunity to Be Heard. On timely request, a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed. If the court takes judicial notice before notifying a party, the party, on request, is still entitled to be heard.

(f) Instructing the Jury. In a civil case, the court must instruct the jury to accept the noticed fact as conclusive. In a criminal case, the court must instruct the jury that it may or may not accept the noticed fact as conclusive.