UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

No. 20-1503 & 23-1214
_____

CENTER FOR BIOLOGICAL DIVERSITY
AND SIERRA CLUB
PETITIONERS

v.

UNITED STATES DEPARTMENT OF ENERGY
RESPONDENT
_____

ON PETITION FOR REVIEW OF ORDERS OF THE
DEPARTMENT OF ENERGY
_____

JOINT BRIEF OF INTERVENORS
ALASKA GASLINE DEVELOPMENT CORPORATION
AND ALASKA LNG PROJECT LLC
IN SUPPORT OF RESPONDENT
_____

Frank T. Richards
President
Alaska Gasline Development Corporation
Suite 505
3201 C Street
Anchorage, AK 99503
(907) 330-6500

Howard L. Nelson
Kenneth M. Minesinger
Greenberg Traurig, LLP
2101 L Street, N.W.
Suite 1000
Washington, DC  20037
(202) 331-3100
*Counsel for Alaska
Gasline Development
Corporation*

Jennifer Brough
Locke Lord LLP
701 Eighth Street, NW
Suite 500
Washington, DC 20001
 (202) 220-6965
jbrough@lockelord.com

*Counsel for Alaska LNG Project LLC*

March 29, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

## No. 20-1503 & 23-1214

————————————

## CENTER FOR BIOLOGICAL DIVERSITY
## AND SIERRA CLUB
## PETITIONERS

### v.

## UNITED STATES DEPARTMENT OF ENERGY
## RESPONDENT

————————————

## ON PETITION FOR REVIEW OF ORDERS OF THE
## DEPARTMENT OF ENERGY

————————————

## JOINT BRIEF OF INTERVENORS
## ALASKA GASLINE DEVELOPMENT CORPORATION
## AND ALASKA LNG PROJECT LLC
## IN SUPPORT OF RESPONDENT

————————————

Intervenors Alaska Gasline Development Corporation ("Alaska Gasline") and Alaska LNG Project LLC ("Alaska LNG") hereby submit this brief in support of the Respondent Department of Energy ("DOE").

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

The undersigned counsel of record certify that the following information required by Circuit Rule 28(a) is true and correct to the best of counsel's knowledge.

## A.    Parties and Amici

The intervenors who appeared before DOE and in this appellate proceeding are listed in Petitioners' brief.

## B.    Rulings Under Review:

(1) *Alaska LNG Project LLC,* Docket No. 14-96-LNG, Order No. 3643-A, Final Opinion and Order Granting Long-Term Authorization to Export Liquefied Natural Gas to Non-Free Trade Agreement Nations ("Order No. 3643-A) (R. 107, J.A. ___);

(2) *Alaska LNG Project LLC,* Docket No. 14-96-LNG, Order No. 3643-C, Affirming and Amending DOE/FE Order No. 3643-A Following Partial Grant of Rehearing Act ("Order No. 3643-C) (R. 162, J.A. ___);

(3) *Alaska LNG Project LLC,* Docket No. 14-96-LNG, Order No. 3643-D, Order Denying Request for Rehearing of DOE/FE Order No. 3643-C Affirming and Amending DOE/FE Order No. 3643-A ("Order No. 3643-D) (R.175, J.A. ___);

## C.    Related Cases

On May 16, 2023, this Court denied the petition for review filed by the Petitioners of the related orders of the Federal Energy Regulatory Commission ("FERC") authorizing the siting, construction and operation of facilities to transport and liquefy natural gas for export pursuant to the order under review in this appeal.

*Center for Biological Diversity, et al. v. FERC,* 67 F.4th 1176 (D.C. Cir. 2023).

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

## No. 20-1503 & 23-1214

————————————

## CENTER FOR BIOLOGICAL DIVERSITY
## AND SIERRA CLUB
## PETITIONERS

### v.

## UNITED STATES DEPARTMENT OF ENERGY
## RESPONDENT

————————————

## ON PETITION FOR REVIEW OF ORDERS OF THE
## DEPARTMENT OF ENERGY

————————————

## JOINT BRIEF OF INTERVENORS
## ALASKA GASLINE DEVELOPMENT CORPORATION
## AND ALASKA LNG PROJECT LLC
## IN SUPPORT OF RESPONDENT

## CORPORATE DISCLOSURE STATEMENT OF ALASKA GASLINE
## DEVELOPMENT CORPORATION

Alaska Gasline Development Corporation is an independent, public corporation of the State of Alaska structured within the Department of Commerce, Community, and Economic Development, for administrative purposes. Alaska Gasline has been given the authority and primary responsibility for developing the Alaska LNG project.

Other than the State of Alaska, Alaska Gasline does not have any parent corporations and there are no publicly held corporations that own at least 10% of its stock.

Respectfully submitted,

*Howard L. Nelson*

Howard L. Nelson
Kenneth M. Minesinger
GREENBERG TRAURIG, LLP
2101 L Street, N.W., Suite 1000
Washington, DC  20037
(202) 331-3163
nelsonh@gtlaw.com

Counsel for Alaska Gasline Development Corporation

March 29, 2024

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————

### No. 20-1503 & 23-1214

————————

## CENTER FOR BIOLOGICAL DIVERSITY
## AND SIERRA CLUB
## PETITIONERS

### v.

## UNITED STATES DEPARTMENT OF ENERGY
## RESPONDENT

————————

## ON PETITION FOR REVIEW OF ORDERS OF THE
## DEPARTMENT OF ENERGY

————————

## JOINT BRIEF OF INTERVENORS
## ALASKA GASLINE DEVELOPMENT CORPORATION
## AND ALASKA LNG PROJECT LLC
## IN SUPPORT OF RESPONDENT

## CORPORATE DISCLOSURE STATEMENT OF ALASKA LNG PROJECT LLC

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, Alaska LNG Project LLC makes the following disclosures:

1.      Alaska LNG Project LLC is a Delaware limited liability company. The current members of Alaska LNG Project LLC are ExxonMobil Alaska LNG LLC, ConocoPhillips Alaska LNG Company, and Hilcorp Alaska LNG, LLC.

2.    The parent entity of ExxonMobil Alaska LNG LLC, Exxon Mobil Corporation, is publicly traded (NYSE: XOM).  The parent entity of ConocoPhillips Alaska LNG Company, ConocoPhillips, is publicly traded (NYSE: COP).  The parent entity of Hilcorp Alaska LNG, LLC, Hilcorp Energy Company, is privately held.

March 29, 2024                              Respectfully submitted,

                                           /s/ Jennifer Brough
                                           Jennifer Brough
                                           Locke Lord LLP
                                           701 Eighth Street, NW
                                           Suite 500
                                           Washington, DC 20001
                                           Telephone: (202) 220-6965
                                           jbrough@lockelord.com
                                           *Counsel for Alaska LNG Project LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY.......................................................................................vi

JURISDICTIONAL STATEMENT ...................................................1

PERTINENT STATUTES AND REGULATIONS...............................1

STATEMENT OF THE CASE.............................................................1

SUMMARY OF THE ARGUMENT ...................................................5

STANDARD OF REVIEW .................................................................7

ARGUMENT ......................................................................................8

  I. PETITIONERS FAIL TO SHOW THAT DOE'S GRANT OF
     EXPORT AUTHORIZATION VIOLATES THE NATURAL
     GAS ACT ...................................................................................8

     A. DOE's Grant of Export Authorization Based on Its
        Finding That Such Authorization Is Not Inconsistent With the
        Public Interest Is Not Arbitrary and Capricious.....................8

     B. Petitioners' Claim That DOE's Reliance on Mitigation
        Ignored the Project's Upstream Impacts on the North Slope Is
        Erroneous and Barred by Preclusion Doctrines ...................15

  II. PETITIONERS FAIL TO SHOW THAT DOE VIOLATED THE
     NATIONAL ENVIRONMENTAL POLICY ACT ...................18

     A. DOE's Analysis of No Action Alternatives Complies
        with NEPA and Is Not Arbitrary and Capricious..................18

i

B. DOE Did Not Violate NEPA Regulations Regarding
Missing Information ................................................................21

III. PETITIONERS FAIL TO ESTABLISH GROUNDS FOR VACTUR .....24

CONCLUSION .....................................................................................25

# TABLE OF AUTHORITIES

**COURT CASES**

*Allen v. McCurry*,
449 U.S. 90 (1980).................................................................................17

*Antero Resources Corp. v. FERC*,
No. 22-1278, 2024 U.S. App. LEXIS 1194 (D.C. Cir. Jan. 18, 2024)................14

*Balt. Gas & Elec. Co. v. Natural Res. Defense Council, Inc.*,
462 U.S. 87 (1983)..............................................................................19

\* *Center for Biological Diversity v. FERC*,
67 F.4th 1176 (D.C. Cir. 2023)................................................5, 8, 16

*City of Dania Beach v. FAA*,
628 F.3d 581 (D.C. Cir. 2010).................................................................17

*City of Dania Beach v. United States Army Corps of Eng'rs*,
No. 12-60989-CIV, 2012 U.S. Dist. LEXIS 93458 (S.D. Fla. July 6, 2012).......17

*Clark-Cowlitz Joint Operating Agency v. FERC*,
775 F.2d 366 (D.C. Cir. 1985).................................................................17

*Eagle County Colo. v. Surface Transp. Bd.*,
82 F.4th 1152 (D.C. Cir. 2023)................................................................14

*Faucett Associates, Inc. v. AT & T*,
744 F.2d 118 (D.C. Cir. 1984).................................................................17

*Kleppe v. Sierra Club*,
427 U.S. 390 (1976)...............................................................................11

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989)..............................................................................19

*Minisink Residents for Envtl. Preservation & Safety v. FERC*,
762 F.3d 97 (D.C. Cir. 2014)..................................................................24

iii

*Otherson v. Department of Justice*,
711 F.2d 267 (D.C. Cir. 1983) ............................................................17

*Parklane Hosiery Co. v. Shore*,
439 U.S. 322 (1979) ............................................................................17

*Sierra Club v. FERC* (Freeport),
827 F.3d 36 (D.C. Cir. 2016) .............................................................11

\* *Sierra Club v. FERC* (FLEX),
867 F.3d 189 (D.C. Cir. 2017) ..............................................6, 7, 8, 10, 11

*United States v. Mendoza*,
464 U.S. 154 (1984) ............................................................................17

*Vecinos para el Bienstarde la Comunidad Costera v. FERC*,
6 F.4th 1321 (D.C. Cir. 2021) ............................................................25

*W. Va. Pub. Servs. Comm'n v. Dep't of Energy*,
681 F.2d 847 (D.C. Cir. 1982) ..............................................................8

## ADMINISTRATIVE CASES

*Alaska Gasline Development Corp.*, 171 FERC ¶ 61,134,
*order on reh'g*, 172 FERC ¶ 61,214 (2020) ........................................3

*Questar Pipeline Co.*,
57 FERC ¶ 61,287 (1991) ...................................................................17

*Southwest Gas Corp.*,
44 FERC ¶ 61,165 (1988) ...................................................................17

**STATUTES & REGULATIONS**

Alaska Natural Gas Pipeline Act,
15 U.S.C. § 720(a)(d) ............................................................. 1

Alaska Natural Gas Transportation Act,
15 U.S.C. § 719 ..................................................................... 1

*Final Guidance on Improving the Process for Preparing Efficient and Timely Environmental Review Under the National Environmental Policy Act*, 77 Fed. Reg. 14473 (Mar. 12, 2012) ............................. 18

Natural Gas Act, § 3,
 15 U.S.C. § 717b ............................................................. 2, 11

Natural Gas Act, § 3(a),
 15 U.S.C. § 717b(a) ............................................................ 8

Natural Gas Act, § 19(b),
 15 U.S.C. § 717r(b) ............................................................ 1

*Presidential Finding Concerning Alaska Natural Gas*,
53 Fed. Reg. 999 (Jan. 15, 1988) ......................................... 1

*Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*,
86 Fed. Reg. 7037 (Jan. 20, 2021) ....................................... 4

40 C.F.R. §1502.14(c) .......................................................... 19

40 C.F.R. §1502.21 .............................................. 21, 22, 23, 24

40 C.F.R. §1502.21(c) .......................................................... 22

\*        Authorities upon which we chiefly rely are marked with asterisks

## GLOSSARY

| | |
|---|---|
| Alaska Gasline | Intervenor Alaska Gasline Development Corporation |
| Alaska LNG | Intervenor Alaska LNG Project LLC |
| North Slope | Alaska North Slope |
| DOE | Respondent Department of Energy |
| EIS | FERC Final Environmental Impact Statement |
| FERC | Federal Energy Regulatory Commission |
| IEA | International Energy Agency |
| NEPA | National Environmental Policy Act |
| NERA | National Economic Research Associates |
| NGA | Natural Gas Act |
| Supplemental EIS | DOE Final Supplemental Environmental Impact Statement |

# JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal under Section 19(b) of the Natural Gas Act ("NGA"), 15 U.S.C. § 717r(b).

# PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in the addendum to Petitioners' Brief. *See* D.C. Cir. Rule 28(a)(5).

# STATEMENT OF THE CASE

Over the last fifty years, the Nation's executive and legislative branches have recognized the enormous benefits that would result from the construction of infrastructure that would allow the vast stranded natural gas resources on the Alaska North Slope ("North Slope") to be brought to market.[1]

Beginning in 2014, the State of Alaska, in conjunction with affiliates of oil and gas producers on the North Slope, developed the Alaska LNG Project to unlock

---

[1] *See, e.g., Alaska Natural Gas Transportation Act,* 15 U.S.C. § 719, et seq., enacted in 1976 to facilitate the development of a transportation system that would unlock and move North Slope gas to market. In 1988, President Reagan made the presidential finding required by the Alaska Natural Gas Transportation Act for Alaska natural gas to be exported to nations other than Canada or Mexico. *Presidential Finding Concerning Alaska Natural Gas*, 53 Fed. Reg. 999 (Jan. 15, 1988). *See also Alaska Natural Gas Pipeline Act*, 15 U.S.C. § 720(a)(d) (2004) (declaring a public need to construct and operate a pipeline system to carry Alaska natural gas to the border between Alaska and Canada).

these gas resources by constructing infrastructure needed to treat, transport and liquefy the natural gas to both meet the demand in Asian countries for LNG, and to a lesser degree serve in-state demand in Alaska for natural gas. The Project includes a gas treatment plant on the North Slope, an 800-mile pipeline, and a liquefaction facility on the Kenai Peninsula.

The Project is expected to (1) meet demand for natural gas within parts of Alaska and contribute supply to meet global demand for LNG; (2) create up to 15,000 jobs during peak construction and over 900 permanent jobs to operate the facilities; (3) increase tax revenues for state and local governments; (4) generate additional royalty revenues to the State of Alaska from oil and gas extraction on state lands; (5) improve the nation's energy security and trade balance with foreign countries; and (6) allow for the substitution of cleaner-burning natural gas for coal and other hydrocarbon fuel and thereby reduce carbon and other greenhouse gas emissions in parts of Alaska and in importing countries that currently rely primarily on coal. R. 28 at 30-36; R. 93 at 4-634 (J.A. ___).

Dual regulatory approval was sought under Section 3 of the NGA, 15 U.S.C. § 717b, from (1) FERC to authorize the siting, construction and operation of the Project facilities; and (2) DOE for authorization to export LNG to both free-trade and non-free trade countries. The export authorization was sought from DOE by Alaska LNG, a group of producers on the North Slope, and FERC authorization was

sought by Alaska Gasline, which was given the primary responsibility by the Alaska Legislature for developing the Project on the state's behalf. [2]  R. 97 at P 16 (J.A. ___).  Both authorizations are needed for the Project to be commercially viable.

FERC, as the lead agency for purposes of the National Environmental Policy Act ("NEPA"), reviewed the environmental impacts of the Project over almost a six-year period.  FERC issued almost 2000 requests for information, and its review culminated in an extensive Final Environmental Impact Statement ("EIS"), comprised of more than 1,500 pages, with an additional 3,550 pages of appendices. R. 93 (J.A. ____).  FERC's EIS analyzed direct impacts on numerous resources from the construction and operation of the facilities, as well indirect impacts from upstream production on the North Slope.  DOE was a cooperating agency for purposes of FERC's NEPA analysis and participated in that process.

In May 2020, FERC approved the construction and operation of the Project facilities.[3]  In August 2020, DOE adopted FERC's EIS and granted export authorization to non-free trade countries based on its finding that the planned exports

---

[2] It is contemplated that at the appropriate time Alaska LNG will transfer the export authorization to Alaska Gasline pursuant to DOE's change of control regulations. *See* R. 107 at 1, n.7 (J.A. ___).

[3]  *Alaska Gasline Development Corp.*, 171 FERC ¶ 61,134, *order on reh'g,* 172 FERC ¶ 61,214 (2020).

were not inconsistent with the public interest.   R. 107 at 52 (J.A. ____); R. 162 at 30 (J.A. ____).

Petitioners appealed both the FERC and DOE authorization orders.  After the appeals were filed, DOE issued Order 3643-B, in which it interpreted an executive order issued by the President as requiring a further evaluation of the impact on greenhouse gas emissions of exporting LNG from the Project.[4] DOE also determined that it would be "prudent" to study potential upstream impacts associated with any incremental natural gas production on the North Slope due to exports of LNG.  R. 126 at 14 (J.A. ____).  Consequently, DOE granted rehearing for the purpose of conducting two additional Alaska-specific environmental studies: (i) a life cycle analysis of greenhouse gas emissions for LNG exported from Alaska; and (ii) an upstream study examining aspects of natural gas production on the North Slope.

After a year and a half of analysis and public comment, DOE issued a Final Supplemental Environmental Impact Statement ("Supplemental EIS"), adding 1,200 pages, including appendices, to the 5,000 pages of environmental impact assessment work published by FERC.  R. 152 (J.A. ____).  DOE performed extensive modeling and detailed analysis of greenhouse gases across the entire life cycle of the Project

---

[4] R. 126 at 12-13 (J.A. ____), *citing* Exec. Order 13990 of Jan. 20, 2021, *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*, 86 Fed. Reg. 7037 (Jan. 25, 2021).

from construction and production through pipeline transportation, liquefaction, tanker transport, regassification, and power generation in destination countries. R. 152 at Vol. 2, App. C, Section 3, at 19-32 (J.A. ___).

On April 13, 2023, DOE in Order No. 3643-C reissued its export authorization based on its initial findings, as supplemented by the analysis and findings in its life cycle and upstream production studies. R. 162 (J.A. ___). On May 16, 2023, this Court rejected all of Petitioners' challenges to the sufficiency of FERC's NEPA analysis of the Project, which DOE has adopted in the orders under review here, and denied Petitioner's appeal of FERC's authorization orders.[5] On June 14, 2023, DOE denied Petitioners' request for rehearing of Order No. 3643-C. R. 175 (J.A. ___). This petition for review followed.

## SUMMARY OF ARGUMENT

This Court's recent rejection of Petitioners' claims that FERC's EIS was deficient, together with DOE's issuance of a Supplemental EIS providing further environmental analysis, has left Petitioners little to challenge. In the FERC EIS, FERC analyzed all direct environmental impacts from the construction and operation of the Alaska LNG Project, as well as indirect impacts caused by upstream gas production of the North Slope. The adequacy of FERC's EIS, which DOE has

---

[5] *Center for Biological Diversity v, FERC*, 67 F.4th 1176 (D.C. Cir. 2023).

adopted to fulfill its NEPA obligations in connection with its export authorization, cannot be challenged again under principles of finality and issue preclusion.

The only environmental impact FERC did not analyze in its EIS is the downstream impacts of greenhouse gas emissions of exports in destination countries, which is not subject to FERC's jurisdiction. While a review of such impacts is within DOE's purview under NEPA, this Court has already found that modeling the effect that LNG exports would have on net global emissions in destination countries would be "too speculative to inform the public interest determination." *Sierra Club v. DOE*, 867 F.3d 189, 193 (D.C. Cir. 2017) ("FLEX")(*"Sierra Club (FLEX)"*). Although DOE performed a life cycle analysis of exports from the Project in its Supplemental EIS to provide additional information to the public, it did so based on its interpretation of an executive order, and not because it was required to do so under NEPA.

Because this Court (1) has already rejected Petitioners' challenges to the sufficiency of FERC's NEPA analysis, which DOE has adopted; and (2) has held that NEPA does not require DOE to analyze unforeseeable emissions impacts from exports in destination countries, Petitioners couch most of their arguments as being grounded in the Natural Gas Act ("NGA"). Petitioners contend that DOE's grant of export authorization was arbitrary and capricious. This Court in *Sierra Club (FLEX)*

rejected the same type of repackaging of claimed NEPA violations as violations of the NGA. *Id.* at 203.

Petitioners' primary argument under the NGA is that DOE inconsistently relied on uncertainty to downplay the Project's climate harms, while ignoring those same uncertainties in determining the Project's benefits. The basis for this argument, however, is a strained analysis of two no action alternatives that DOE provided to meet its NEPA obligations. Petitioners are conflating and misapplying DOE's analysis of no action alternatives under NEPA with its substantive determination under the NGA that the requested export authorization is not inconsistent with the public interest. When DOE's balancing of harms and benefits of the Project is properly reviewed, assuming the Project *is* built, the market uncertainties noted by DOE, are not unevenly applied. Thus, DOE's grant of export authorization is not arbitrary and capricious.

## STANDARD OF REVIEW

Intervenors adopt the Respondent's statement of the standard of review.

## <u>ARGUMENT</u>

## I.  PETITIONERS FAIL TO SHOW THAT DOE'S GRANT OF EXPORT AUTHORIZATION VIOLATES THE NATURAL GAS ACT

### A.  DOE's Grant of Export Authorization Based on Its Finding That Such Authorization Is Not Inconsistent With the Public Interest Is Not Arbitrary and Capricious.

Section 3(a) of the NGA provides that DOE "shall authorize exports to non-FTA nations unless …. it finds that the proposed exportation … will not be consistent with the public interest."  15 U.S.C. § 717b(a) (emphasis added).  This standard creates a presumption favoring export authorization.[6]  Absent an express finding that the proposed activity would not be consistent with the public interest, authorization must be granted.[7]

Petitioners offer no basis to conclude that DOE acted arbitrarily and capriciously in failing to find that this presumption has been overcome in this case. Petitioners argue that DOE both overstated uncertainties in predicting climate harm

---

[6] *CBD,* 67 F.4th at 1188, *citing W. Va. Pub. Servs. Comm'n v. Dep't of Energy*, 681 F.2d 847, 856 (D.C. Cir. 1982).  (Section 3 sets out a general presumption favoring such authorization, by language which requires approval of an application unless there is an express finding that the proposed activity would not be consistent with the public interest.).  *See also Sierra Club v. DOE (FLEX*) 867 F.3d 189, 203 (D.C. Cir. 2017)*.

[7] *Id.*

and inconsistently applied these uncertainties to Project benefits. Neither argument has merit.

DOE found that it could not make a definitive conclusion about the magnitude of emissions and climate impacts associated with exports from the Project due to uncertainties inherent in predicting future energy market behavior and energy consumption around the world. R. 162 at 24 (J.A. ___). DOE rationally found that emissions caused by LNG exports are a function of energy production and consumption, which in turn are impacted by economic and political factors affecting future oil and gas global markets. *Id* at 22-23. In particular, the extent to which LNG exported to destination countries from the Project will substitute for more emission-producing fuel used for power generation such as coal and oil, which will *reduce* emissions, is not reasonably foreseeable. *Id*.[8]

---

[8] Although the extent of fuel-switching cannot be predicted, LNG exports from the Project may very well reduce global emissions because it is likely that coal-fired power generation prevalent in the destination countries will be displaced by less emission-producing LNG. As stated by Alaska Gasline in comments on DOE's Supplemental EIS, the International Energy Agency ("IEA") reports that coal is still the largest source of electricity generation in the world and the largest source of energy-related CO2 emissions. International Energy Agency (IEA), Coal 2021, Analysis and Forecast to 2024 (December 2021). https://www.iea.org/reports/coal-2021. IEA also reports that coal demand in China, which uses more than half of the coal used in the world, is expected to grow between 2022 and 2024 despite "a decade of strong and sustained efforts to diversify the country's power mix." *Id.* at Executive Summary. R. 493 at 9 (J.A. ___).

Rather than speculate on the many potential iterations of global LNG demand and potential for other countries to shift from one fuel to another, DOE reasonably provided an overview of global energy markets, described potential for changes in those markets, and assessed emissions from LNG consumption in four destination countries, both with and without carbon capture in the destination country. R. 152 at Vol. 2, App. C, Section 2, at 10-18 and Section 4, at 36-65 (J.A. ___). Based on its qualitative analysis of global markets, and its life cycle study, DOE reasonably provided a range of estimates of net emissions associated with LNG exports to destination countries.

DOE's findings regarding the uncertain quantitative impact of LNG exports on global emissions are consistent with findings of this Court. Most prominently, this Court in *Sierra Club v. DOE (FLEX)*, 867 F.3d 189, 193 (D.C. Cir. 2017) rejected Sierra Club's argument that DOE failed to perform a tailored analysis of the indirect and cumulative environmental effects of LNG exports, relying instead on life cycle studies that evaluated generic amounts of LNG exports. With respect to downstream impacts of LNG consumption in importing countries, the Court upheld DOE's finding that such impacts were not reasonably foreseeable. *Id.* at 202. The Court cited with approval DOE's explanation that modeling the net effect that LNG exports would have in each destination country given the potential for LNG to substitute for other fuel sources would require consideration of the dynamics of all

energy markets in these countries. The Court agreed with DOE that such an analysis would be "too speculative to inform the public interest determination" and might well be restricted by "practical considerations of feasibility."[9]

In *Sierra Club (FLEX),* the Court rejected Petitioners' argument that DOE's failure to sufficiently consider downstream export impacts violated its obligation to take the "hard look" required by NEPA. *Sierra Club v. DOE (FLEX)*, 867 F.3d 189, 196-197 (D.C. Cir. 2017). Having lost that battle, Petitioners make the same claim here in support of its argument that DOE failed to properly weigh the benefits and harms of the Project under the NGA. This argument, dressed differently, fares no better. If downstream emission impacts in foreign countries are not reasonably foreseeable for purposes of informing the public under NEPA, any alleged failure to adequately quantify and weigh these impacts cannot be sufficient to overcome the presumption provided by Section 3 of the NGA that export authorization should be granted.[10]

Petitioners' contention that DOE inconsistently applied this uncertainty to climate impacts but not project benefits is a red herring. Petitioners' argument is

---

[9] *Sierra Club v. DOE (FLEX),* 867 F.3d 189, 202 (D.C. Cir. 2017), *citing Sierra Club v. FERC (Freeport)*, 827 F.3d 36, 50 (D.C. Cir. 2016), *quoting Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976).

[10] *See Sierra Club v. DOE (FLEX),* 867 F.3d at 202.

premised on the notion that if the Project is not built, the undisputed benefits resulting from the Project will not occur, and are, therefore, uncertain. But that is true of every permit or license granted by any regulatory agency. Petitioners are conflating DOE's obligation under the NGA to determine the public interest in granting export authorization with its obligation under NEPA to consider the no action alternative of not granting export authorization. DOE weighed the benefits and environmental impacts of the Project, assuming the Project is built and LNG is exported, and found that these exports are not inconsistent with the public interest. On the other hand, if the Project is not built (*i.e.,* no action), and no LNG is exported, there will be no harm nor benefits.[11] There is no inconsistency.

Petitioners contend (at 32-33) that it is inconsistent to rely on uncertainty "as to market need as a reason to dismiss harms while, on the other hand, downplay and ignore uncertainty as to market need when evaluating benefits." This argument misstates both DOE's orders in the case and its long-standing policies. In the orders

_____

[11] Petitioners also speculate (at 33) that the Project will be built, but will sit unutilized or underutilized. But such a scenario will never occur because, as Petitioners acknowledge (at 57), the Project needs customers and financing commitments to proceed to a Final Investment Decision. It is inconceivable to suggest that Alaska Gasline or any project developer will construct a project of this magnitude if it would be unutilized, or not utilized sufficiently to recoup its investment, or that the investment community will finance the project without sufficient customer commitments.

under review, DOE has not relied on uncertain market need to dismiss harms. The uncertainty noted by DOE with respect to emissions impacts is based on an inability to reliably predict energy consumption patterns and fuel-switching in dynamic global energy markets, not uncertainty about market need.

Moreover, rather than finding market need uncertain, DOE clearly stated it has no obligation to examine market need. R. 175 at 50 (J.A. ___). In addition to being barred by their failure to preserve this argument on rehearing,[12] Petitioners' argument is a collateral attack on DOE's long-standing policy that market need for exports need not be shown because the market, not the government, is best suited to make that determination.[13]

In short, the uncertainties are not, as Petitioners claim, the same. The uncertainty of net emissions from the Project is a function of changing political and market dynamics affecting fuel-switching and LNG consumption, while the uncertainty Petitioners claim exists as to Project benefits stems from Petitioners'

---

[12] *See* DOE Brief at 49-50.

[13] R. 73 at 4 (J.A. ___); R. 107 at 10-11 (J.A. ___); R. 175 at 50 (J.A. ___), *citing* DOE's 1984 Policy Guidelines and precedent establishing that DOE is not required to by statute or its regulations to examine market need. *See* Policy Guidelines and Delegation Orders Relating to the Regulation of Imported Natural Gas, R. 1 (J.A. ___); *Freeport LNG Expansion, L.P. and FLNG Liquefaction, LLC*, R. 22 at 112 (J.A. ___) (the market is the most efficient means of allocating natural gas supplies).

assertion that there is no market need for the Project, and that the Project may not be built. However, market need is not a factor that DOE has or is required to examine, and if the Project is not built there will be no harm or benefits.

Petitioners' reliance on *Eagle County Colo. v. Surface Transp. Bd.,* 82 4th 1152, 1193-94 (D.C. Cir. 2023) is misplaced. Petitioners cite (at 32) to the Court's statement in *Eagle County* that a project that may not materialize cannot accomplish the merits identified. In that case, however, the Court rejected the Surface Transportation Board's contention that it need not consider the financial viability of a rail project because the Board's own Rail Policies and precedent required it to do so. *Id.* at 1193-94. In *Eagle County,* the Court found that the agency was required to inquire into whether the project would materialize because the agency's own policies required it to. In contrast, DOE's policy and precedent since 1984 has been not to determine market need in order to minimize federal control and involvement in energy markets.[14] Whether the Project will materialize will be decided by the market, not DOE.[15]

---

[14] *See* 1984 Policy Guidelines and precedent cited in n. 12, *supra.*

[15] Petitioners' argument that the Project may not materialize due to a lack of market need demonstrates a lack of standing to challenge DOE's export authorization. Standing requires a showing of "concrete, particularized, actual and imminent" harm. *See Antero Resources Corp. v. FERC*, No. 22-1278, 2024 U.S. App. LEXIS 1194 (D.C. Cir. Jan. 18, 2024) (citing more recent requirement for searching inquiry on imminent harm). See Addendum.

**B.     Petitioners' Claim That DOE's Reliance on Mitigation Ignored the Project's Upstream Impacts on the North Slope Is Erroneous and Barred By Preclusion Doctrines.**

Petitioners contend (at 36-38) that DOE dismissed significant upstream development impacts that the Project would have on permafrost, wetlands and subsistence users on the North Slope. Petitioners state that these impacts would not occur without construction of the Project, which would not occur without DOE's export authorization.

Petitioners' argument fails for several reasons. First, Petitioners misconstrue DOE's discussion of significant impacts to these resources. The discussion Petitioners cite to relates to impacts of the entire Project – not upstream production -- on these resources. R. 162 at 14-15 (J.A. __). However, by virtue of its jurisdiction over the Project facilities, FERC already exhaustively analyzed these impacts in the EIS that DOE adopted and considered in its orders.

Second, with respect to upstream impacts from gas production, DOE did not "dismiss" these impacts. As it explained in Order No. 3643-D, DOE's Supplemental EIS did not alter the analysis or conclusions presented in FERC's EIS, which DOE adopted. Moreover, DOE's Supplemental EIS did in fact consider the additional impacts from potential upstream development. R. 175 at 22 (J.A. ___).

Whether Petitioners' argument is aimed at all impacts from the Project, or just upstream impacts of the Project, the argument is barred because the Court in *CBD* has already rejected Petitioners' challenges to FERC's EIS. Any impacts to permafrost, wetlands and subsistence users would be created by the construction and operation of the Project, not by exports, and were reviewed by FERC in its EIS. R. 93 at 4-62-120, 4-227-250, and 4-733-913 (J.A. ___). FERC also analyzed the indirect impacts resulting from induced natural gas production on the North Slope. R. 93 at 4-1157-1222 (J.A. ___). Petitioners contended in their appeal of FERC's authorization that FERC failed to consider, *inter alia*, indirect emissions from induced upstream gas production.[16] This Court rejected Petitioners' argument in *CBD*.[17] Arguments that Petitioners raised, or could have raised, at FERC concerning impacts from the construction and operation of the Project, as well as indirect impacts from gas production on the North Slope, are barred by the doctrines of collateral estoppel and res judicata.[18] These doctrines have been applied to preclude

---

[16] Petitioners' Opening Brief in Case No. 20-1379, dated February 22, 2022, at 28-29.

[17] *Center for Biological Diversity v. FERC*, 67 F.4th 1176, 1185-86 (D.C. Cir. 2023).

[18] These two doctrines are related preclusion doctrines intended to prohibit the relitigation of claims that have already been decided, or issues that should have been raised in prior litigation. The doctrine of collateral estoppel (or issue preclusion) forecloses litigation of issues that were actually litigated and necessarily decided by

NEPA challenges to an action by a cooperating agency that adopted a lead agency's

NEPA analysis that was previously challenged.[19]

Petitioners' argument is also inconsistent with their previous arguments made

to FERC and this Court in *CBD*. At FERC, Petitioners argued that exports are an

indirect impact of FERC's facilities authorization and must be analyzed by FERC.

In this case, they argue the opposite: that construction of the facilities is an indirect

impact of DOE's export authorization. If Petitioners are permitted to relitigate the

sufficiency of FERC's EIS a second time in connection with DOE's adoption of that

same EIS, not only would such a result be prohibited by the doctrines of collateral

---

a valid and final judgment between the parties on the same or a different claim. The doctrine of res judicata (or claim preclusion) prohibits parties from relitigating claims or arguments that were or could have been raised in a prior action. *Clark-Cowlitz Joint Operating Agency v. FERC,* 775 F.2d 366, 373-74 (D.C. Cir. 1985), *citing United States v. Mendoza,* 464 U.S. 154, 157-59 (1984)*; Allen v. McCurry,* 449 U.S. 90, 94 (1980)*; Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 (1979)*; Faucett Associates, Inc. v. AT & T,* 744 F.2d 118, 125 (D.C. Cir. 1984)*, Otherson v. Department of Justice,* 711 F.2d 267, 271, 273 (D.C. Cir. 1983). Both doctrines are equally applicable to administrative proceedings. *See Questar Pipeline Co.*, 57 FERC ¶ 61,287, at 61,939 (1991), *quoting Allen v. McCurry*, 449 U.S. 90, 94 (1980); *Southwest Gas Corp.*, 44 FERC ¶ 61,165, at 61,545-46 (1988).

[19] *See City of Dania Beach v. United States Army Corps of Engineers*, No. 12-60989-CIV, 2012 U.S. Dist. LEXIS 93458, 2012 WL 3731516 (S.D. Fla. July 6, 2012), attached in the Addendum to this brief, (finding that a challenge to the United States Army Corps of Engineers' rejection of an alternative runway was precluded because this Court had previously affirmed the rejection of that alternative by the Federal Aviation Agency, the lead agency for the NEPA review of the expansion project). *See* pages A-10-11 of the Addendum, *citing City of Dania Beach v. FAA,* 628 F.3d 581, 591 (D.C. Cir. 2010).

estoppel and res judicata, it would result in duplicative and costly environmental reviews contrary to the entire purpose of having a lead agency conduct NEPA reviews that other permitting agencies can rely upon and adopt. The result would be inefficient duplicative reviews of the same project by two agencies.[20]

## II. PETITIONERS FAIL TO SHOW THAT DOE VIOLATED THE NATIONAL ENVIRONMENTAL POLICY ACT.

### A. DOE's Analysis of No Action Alternatives Complies with NEPA and Is Not Arbitrary and Capricious.

Petitioners contend that by presenting two no action alternatives that provide a range of outcomes, DOE failed to provide a meaningful no action analysis. They contend (at 28-29) that by providing a range of no action outcomes DOE "manufactured unnecessary uncertainty" which "allowed it to effectively ignore a huge portion of the Project's harms." This argument deserves little response. DOE reasonably presented two no action alternatives that produce different amounts of

---

[20] The result advocated by Petitioners is also inconsistent with the lead agency concept and numerous pronouncements by the Council on Environmental Quality, which has repeatedly encouraged agencies to avoid duplicative NEPA reviews by adopting other agency's environmental analyses. *See, e.g.,* CEQ's 2012 Final Guidance on Improving the Process for Preparing Efficient and Timely Environmental Reviews under the National Environmental Policy Act. In this Guidance, CEQ encouraged agencies to coordinate and take advantage of existing documents and studies. CEQ stated that "Coordinated and concurrent environmental reviews are appropriate whenever other analyses, surveys, and studies will consider the same issues and information as a NEPA analysis." 77 Fed. Reg. 14473, 14478 (Mar. 12, 2012).

net emissions if exports from the Project were not authorized. DOE did not ignore those emissions.

The purpose of analyzing no action alternatives is to inform the public of a baseline against which the impacts of the proposed action can be compared and contrasted.[21] As Petitioners acknowledge, the purpose of NEPA generally is to produce information that will meaningfully inform the public of environmental impacts and to inform agency decision-making.[22]

Due to the energy market and other uncertainties discussed above in connection with determining the extent to which other LNG exports would meet global LNG demand if exports from this Project were not authorized, DOE reasonably provided two no action alternatives based on different assumptions. These alternatives assume that if exports from the Alaska LNG Project were not authorized, either equivalent amounts of energy would be obtained from other sources (Alternative 1), or that no energy would substitute for the LNG that would be exported from the Project (Alternative 2).

---

[21] 40 C.F.R §1502.14(c).

[22] Petitioners' Brief at 45, *citing Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989); *Balt. Gas & Elec. Co. v. Natural Res. Defense Council,* 462 U.S. 87, 97 (1983).

Petitioners argue that by providing a range within these two no action "bookends" without determining where in the middle of that range actual emissions will result if exports from this Project are not authorized fails to provide a meaningful no action alternative. This argument ignores DOE's rationale for providing the range and is based on the same demand for more precision that, as discussed above, this Court has already held would be speculative and DOE does not have to provide.

As DOE explained, given the complexities of energy markets and the uncertainties inherent in predicting further energy market behavior and energy consumption, including fuel-switching, around the world, any attempt to make a definitive conclusion about the magnitude of greenhouse gas emissions and resulting climate change impacts would be speculative. R. 162 at 23-25, 41-42 (J.A. ___); R. 175 at 17-20 (J.A. ___). As DOE reasonably found, its approach of calculating best-case and worst-case scenarios provides decision-makers and the public with useful information to assess potential emissions.

The specificity demanded by Petitioners is neither possible nor required by NEPA. By assuming all LNG exported from the Project would be incremental to global markets in its no action Alternative 2, DOE has presented a "true" no action alternative that allows a comparison of the Project's impacts to a scenario where LNG exports from the Project do not occur and are not replaced by another energy

source. The notion that DOE violated NEPA by analyzing a second no action alternative that provided more information and exceeded its obligations is ludicrous.

## B. DOE Did Not Violate NEPA Regulations Regarding Missing Information.

Petitioners contend (at 52-56) DOE violated Section 1502.21 of the regulations of the Council on Environmental Quality, 40 C.F.R. §1502.21, by (1) not using available modeling to identify a narrower range of no action alternatives; or (2) failing to adequately examine North Slope impacts. DOE explained in its orders that it fully complied with its obligations with respect to missing or incomplete information by disclosing, examining and evaluating such impacts, quantifying a range of emissions from taking no action and explaining why more precise quantification of net global emissions was not feasible. R. 175 at 23-24 (J.A. ___).

Petitioners contend that DOE could have provided a more realistic no action alternative by relying on an economic model prepared by National Economic Research Associates ("NERA") included in Alaska Project LLC's application submitted in 2014. As DOE noted, Petitioners do not explain how a report issued nine years ago when LNG markets were less developed could provide more precise information today. R. 175 at 51 (J.A. ___). Moreover, Petitioners do not explain how the NERA study or other economic models could reliably predict fuel switching in global markets in light of the uncertainties DOE identified.

Finally, Petitioners misapply Section 1502.21. This regulation imposes disclosure and other requirements "if the information relevant to *reasonably foreseeable significant adverse impacts* cannot be obtained because the *overall costs of obtaining it are unreasonable or the means to obtain it are not known.*" 40 C.F.R. § 1502.21(c) (emphasis provided). In this case, DOE did not claim that reasonably foreseeably significant impacts could not be obtained because they were too costly or unknown. As discussed above, DOE's decision not to provide a more precise quantification of downstream emissions is not that information is missing, it is that any study that would attempt to provide greater specificity would be too speculative and unreliable.[23] Indeed, recent world events like the Ukraine invasion by Russia, which impacted global LNG demand, illustrate that such studies cannot reliably predict future LNG demand despite being based on the best information known at the time.

---

[23] The NERA study examined LNG demand for the purpose of determining whether sufficient gas supply would be available to meet demand in Alaska if the full requested volume was exported for the life of the project. That analysis was done because availability of gas for domestic use is one of the criteria used by DOE to determine whether an export authorization should be issued. See R. 107 at 12, 18-19 (J.A. ___). The study did not attempt to predict the extent to which LNG exported to destination counties would be burned in addition to, or in lieu of, other less emission-producing fuel sources for electric generation, or attempt not to quantify net global emissions impacts.

Petitioners also contend (at 54-55) that DOE failed to comply with Section 1502.21 in its analysis of North Slope impacts. This argument is based on one statement in the Supplemental EIS that the exact locations of components of the Point Thomson Unit Expansion Project, such as new pads, wells, access roads and pipelines were unknown at that time. R. 525 at 4.1-2 (J.A. ___). As discussed above, however, impacts from the construction of upstream production facilities were described and analyzed in FERC's EIS, which has been found by the Court to comply with NEPA. Petitioners are not permitted to relitigate this issue.

Even if it was not barred, this argument is meritless. First, Petitioners only cite to half of DOE's finding. The entire sentence states that although the exact locations of these components were unknown at the time, "the majority of activities would only affect surficial soil resources and have minimal impact on the deep geological features encompassed in the area." R. 525 at 4.1-2 (J.A. ___). Second, DOE explained that its analysis of upstream impacts supplements the wealth of information already provided as to impacts on the North Slope in FERC's EIS with reasonable projections and qualitative analyses where possible. R. 175 at 24-25 (J.A. ___). Petitioners also ignore DOE's detailed explanation that in the absence of specific locations for a project feature, it developed a range of potential impacts based on other design data, which includes an upper bound that provides decision-makers with needed information. R. 525 at 4.21-1 (J.A. ___).

In short, Petitioners flyspeck of one statement concerning a lack of exact locations for planned pads, wells and access roads ignore DOE's robust discussion of potential impacts from the upstream facilities that will be needed on the North Slope as part of the Project.[24]  Petitioners do not explain how "theoretical approaches or generally accepted research methods" could have been used by DOE to provide a more precise analysis in the absence of known locations for these minor facilities relative to the Project.   In sum, DOE was able to determine reasonably foreseeable significant adverse impacts on the North Slope and did not violate Section 1502.21.

## III.   PETITIONERS FAIL TO ESTABLISH GROUNDS FOR VACATUR

Petitioners contend (at 56-58) that DOE's alleged failure to comply with the requirements of the NGA and NEPA requires vacatur.  Assuming, *arguendo,* the Court finds DOE failed to sufficiently analyze or balance downstream environmental impacts of exports from the Project, the appropriate course of action would be to remand the orders to DOE to either explain its actions or perform the required analysis.   DOE's authorization of exports based on its determination that such authorization "is not inconsistent with the public interest" should not be disturbed

---

[24] *See, e.g., Minisink Residents for Envtl. Preservation & Safety v. FERC*, 762 3d 97, 112-113 (D.C. Cir. 2014).

because it would be reasonably likely that DOE would reach the same result on remand.

Conversely, as Petitioners acknowledge (at 57), vacatur would impede efforts to secure customers and financing for the Project. *Vecinos para el Bienstarde la Comunidad Costera v. FERC*, 6 F.4th 1321, 1332 (D.C. Cir. 2021). Vacatur would also inappropriately jeopardize the extensive, costly and time-consuming effort of numerous government agencies and stakeholders that have analyzed this Project over a span of nine years and found it to be consistent, and in the case of DOE not inconsistent, with the public interest.

## CONCLUSION

For the aforementioned reasons, the petition for review should be denied.

Respectfully submitted,

/s/ *Jennifer Brough*
Jennifer Brough
Locke Lord LLP
701 Eighth Street, NW
Suite 500
Washington, DC 20001
 (202) 220-6965
jbrough@lockelord.com

*Counsel for Alaska LNG Project LLC*

/s/ *Howard L. Nelson*
Howard L. Nelson
Kenneth M. Minesinger
Greenberg Traurig, LLP
2101 L Street, N.W.
Suite 1000
Washington, DC  20037
(202) 331-3100
nelsonh@gtlaw.com

*Counsel for Alaska Gasline Development Corporation*

March 29, 2024

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing complies with Fed. R. App. P. 32(a)(2) because it contains 5,885 words, excluding the parts exempted by D.C. Circuit Rule 32(e)(2).

I further certify that the foregoing complies with the requirements of Fed. R. App. P. 32(a)(5)(A)-(B) because it has been prepared in Times New Roman 14-point font using Microsoft Word.

Respectfully submitted,

/s/ *Howard L. Nelson*

Howard L. Nelson

March 29, 2024

**ADDENDUM**

**TABLE OF CONTENTS**

*Antero Resources Corp. v. FERC*,
No. 22-1278, 2024 U.S. App. LEXIS 1194 (D.C. Cir. Jan. 18, 2024).... A-1

*City of Dania Beach v. United States Army Corps of Eng'rs*,
2012 U.S. Dist. LEXIS 93458 (S.D. Fla. July 6, 2012) ......................... A-5

No *Shepard's* Signal™
As of: January 26, 2024 5:45 PM Z

## *Antero Res. Corp. v. FERC*

United States Court of Appeals for the District of Columbia Circuit

January 18, 2024, Filed

No. 22-1278 Consolidated with 22-1280

**Reporter**
2024 U.S. App. LEXIS 1194 *; 2024 WL 194189

ANTERO RESOURCES CORPORATION AND MU MARKETING LLC, PETITIONERS v. FEDERAL ENERGY REGULATORY COMMISSION, RESPONDENT; PROJECT CANARY AND TENNESSEE GAS PIPELINE COMPANY, L.L.C., INTERVENORS

**Notice:** THIS OPINION IS SUBJECT TO FORMAL REVISION BEFORE PUBLICATION IN THE FEDERAL REPORTER OR U.S. APP. D.C. REPORTS. USERS ARE REQUESTED TO NOTIFY THE CLERK OF ANY FORMAL ERRORS IN ORDER THAT CORRECTIONS MAY BE MADE BEFORE THE BOUND VOLUMES GO TO PRESS.

**Prior History:** [*1] On Petitions for Review of Orders of the Federal Energy Regulatory Commission.

## Core Terms

pooling, pipeline, rates, opening brief, oral argument, producers, natural gas, transportation, reply, methane, orders

**Counsel:** For Antero Resources Corporation, MU Marketing LLC, Petitioners (*22-1278*): Charlotte Taylor, Jones Day, Washington, DC; James Edwin Olson, Esquire, Jones Day, Houston, TX.

For Federal Energy Regulatory Commission, Respondent (*22-1278*): Carol Jayne Banta, Attorney, Matthew Robert Christiansen, Robert Harris Solomon, Esquire, Solicitor, Federal Energy Regulatory Commission, Washington, DC.

For Project Canary, Intervenor for Respondent (*22-1278*): Michael F. McBride, Attorney, Van Ness Feldman LLP, Washington, DC.

For Tennessee Gas Pipeline Company, L.L.C., Intervenor for Respondent (*22-1278*): Paul Korman, Attorney, Michael Diamond, Van Ness Feldman LLP, Washington, DC.

For Environmental Defense Fund, Amicus Curiae for Petitioner (*22-1278*): Natalie Marie Karas, Attorney, Jason Tyler Gray, Duncan & Allen LLP, Washington, DC.

For EQT Energy, LLC, Petitioner (22-1280): Barbara Schneider Jost, David Morris Gossett, Davis Wright Tremaine LLP, Washington, DC; Shannon Eide O'Neil, David Wright Tremaine LLP, Washington, DC.

For Federal Energy Regulatory Commission, Respondent (22-1280): Carol Jayne Banta, Attorney, Matthew [*2] Robert Christiansen, Robert Harris Solomon, Esquire, Solicitor, Federal Energy Regulatory Commission, Washington, DC.

For Environmental Defense Fund, Amicus Curiae for Petitioner (22-1280): Natalie Marie Karas, Attorney, Jason Tyler Gray, Duncan & Allen LLP, Washington, DC.

**Judges:** Before: SRINIVASAN, Chief Judge, WALKER, and PAN, Circuit Judges.

## Opinion

### JUDGMENT

These consolidated cases were considered on the record from the Federal Energy Regulatory Commission and on the briefs and arguments of the parties. The Court has accorded the issues full consideration and has determined that they do not warrant a published opinion. *See D.C. Cir. R. 36(d)*. It is:

**ORDERED AND ADJUDGED** that the petitions for review be **DISMISSED**.

* * *

Tennessee Gas Pipeline Company, L.L.C. ("Tennessee") is a pipeline company that sought and received approval from the Federal Energy Regulatory Commission ("FERC") to implement a "pooling service" for buyers and sellers of responsibly sourced gas that is "producer certified." *Tenn. Gas Pipeline Co., L.L.C., 179 FERC ¶ 61,233 (2022)* (Tariff Order), *modified on denial of reh'g*, *181 FERC ¶ 61,063 (2022)* (Rehearing Order). Petitioners Antero Resources Corporation and MU Marketing LLC (together, "Antero") and

EQT Energy, LLC are producers of responsibly sourced gas that have used Tennessee's [*3] gas transportation services. Petitioners challenge FERC's approval of the new pooling service, asserting that they are harmed by Tennessee's unsupervised control over the environmental standards delineating what gas can be bought and sold within the producer-certified pool. Because petitioners fail to establish standing, we dismiss their petitions for review.

I.

Under the Natural Gas Act ("NGA"), FERC has jurisdiction over the interstate transportation and wholesale sale of natural gas. *See 15 U.S.C. § 717(a)-(b)*. To ensure that gas pipelines charge "just and reasonable rates" for transportation, the NGA requires pipelines to file "all rates and charges for any transportation or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges" in public tariffs overseen by FERC. *15 U.S.C. § 717c(c)*; *see also 18 C.F.R. § 154.1(b)*.

As part of this mandate, FERC regulates pooling services operated by pipelines. "Pooling refers to the aggregation of gas from multiple physical or logical points to a single physical or logical point." *18 CFR Part 284: Standards for Bus. Pracs. of Interstate Nat. Gas Pipelines, 83 FERC ¶ 61,029, at P 4 (1998)*. Pooling brings buyers and sellers together at certain points, thereby facilitating their transactions. Pooling can be achieved physically or virtually — "paper pooling" [*4] combines an accounting fiction and a scheduling service to enable sales to occur. *See Transcon. Gas Pipe Line Corp., 130 FERC ¶ 61,109, at P 5 n.7 (2010)* ("Paper pooling refers to the establishment of a paper or virtual pool into which gas supplies may be injected without charge from anywhere within [a geographical] zone.").

Tennessee has offered paper pooling for years as a free and voluntary option within its gas transportation services; it files the terms of this existing service in its FERC-approved tariff. *Tenn. Gas Pipeline Co., LLC, 73 FERC ¶ 61,278, 61,764-65 (1995)*. In 2021, Tennessee proposed adding a new service option to its pipeline system — a paper pooling option exclusively for responsibly sourced gas ("RSG"). RSG refers to gas produced in a more environmentally conscious way, often with lower methane emissions. To use the new pooling option, gas producers must certify that their gas meets certain environmental criteria. Such "producer-certified gas" is known as "PCG." The PCG pooling service is free and offers the same services as Tennessee's existing paper pooling service. Because there is no industry-wide standard for defining RSG, Tennessee sets its own "PCG criteria," which are posted on its website.

Petitioners allege that FERC's approval of the new pooling service was arbitrary and capricious [*5] because the Commission declined to exercise any oversight over the PCG criteria that governs access to the service. Tennessee's tariff incorporating the new service option went into effect on July 1, 2022. FERC denied petitioners' requests for rehearing on October 25, 2022, and petitioners timely petitioned for review before this court.

II.

Under the *Natural Gas Act*, "[a]ny party to a proceeding . . . aggrieved by an order issued by the Commission in such proceeding" can seek judicial review. *15 U.S.C. § 717r(b)*. Parties are aggrieved under the Natural Gas Act if they satisfy the constitutional and prudential requirements for standing. *See PNGTS Shippers' Grp. v. FERC, 592 F.3d 132, 136, 389 U.S. App. D.C. 79 (D.C. Cir. 2010)*. Petitioners bear the burden of proving the elements of constitutional standing: (i) a concrete and particularized injury, (ii) a causal link between that injury and the FERC order being challenged, and (iii) that the injury will likely be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)*.

Petitioners in cases involving direct review of administrative actions must set forth their basis for standing in a separate section of their opening brief; and must provide both arguments and evidence of standing where standing is not apparent from the administrative record. *See D.C. Cir. R. 28(a)(7)*.[1] Evidence that is lengthy and not contained [*6] in the administrative record should be submitted along with the opening brief. *Id.*; *see also Sierra Club, 292 F.3d at 900*. Standing arguments raised in a reply brief are ordinarily forfeited. *Scenic Am., Inc. v. DOT, 836 F.3d 42, 53 n.4, 425 U.S. App. D.C. 422 (D.C. Cir. 2016)* ("Although a party cannot forfeit a claim that we lack jurisdiction, it can forfeit a claim that we possess jurisdiction."). Importantly, to establish standing in an agency appeal, a petitioner must rely on evidence — rather than on factual allegations — because "a petitioner seeking review in the court of appeals does not ask

---

[1] The rule states, in relevant part: "In cases involving direct review in this court of administrative actions, the brief of the appellant or petitioner must set forth the basis for the claim of standing. This section, entitled 'Standing,' must follow the summary of argument and immediately precede the argument. When the appellant's or petitioner's standing is not apparent from the administrative record, the brief must include arguments and evidence establishing the claim of standing. *See Sierra Club v. EPA, 292 F.3d 895, 900-01, 352 U.S. App. D.C. 191 (D.C. Cir. 2002)*. If the evidence is lengthy, and not contained in the administrative record, it may be presented in a separate addendum to the brief." *D.C. Cir. R. 28(a)(7)*.

the court merely to assess the sufficiency of its legal theory. Rather, like a plaintiff moving the district court for summary judgment, the petitioner is asking the court of appeals for a final judgment on the merits." *Sierra Club, 292 F.3d at 899*.

This court enforces *Rule 28(a)(7)* less stringently only where it excuses petitioners' omissions in their opening briefs for good cause. This court has previously found good cause in two circumstances: (1) where "the parties reasonably, but mistakenly, believed that the initial filings before the court had sufficiently demonstrated standing"; and (2) "where the parties reasonably assumed that their standing was self-evident from the administrative record." *Twin Rivers Paper Co. LLC v. SEC, 934 F.3d 607, 614, 443 U.S. App. D.C. 74 (D.C. Cir. 2019)* (cleaned up). Neither exception applies [*7] here, and neither petitioner has asserted that this case falls under an exception.

III.

Petitioners were required to establish standing in their opening brief, but they did not do so. Their standing is not obvious from the administrative record. FERC's order does not directly regulate petitioners; and it does not affect the rates or terms of the existing transportation service that petitioners receive from Tennessee. Instead, petitioners allege that FERC's refusal to assert jurisdiction over the PCG criteria will affect the price that petitioners can charge for selling their RSG. Petitioners must explain and support the causal connection between FERC's order and those alleged effects, but as explained below, they do not do so. The PCG pooling service option has been in effect for over a year, but neither petitioner has provided evidence of a concrete or imminent harm to their economic interests.

A.

Antero's allegation of harm in the standing section of its opening brief states only this:

> Pipeline customers like Antero have standing to challenge FERC orders approving changes to pipeline "rates" and "polic[ies]". *See [Miss. Valley Gas Co. v. FERC, 68 F.3d 503, 507, 314 U.S. App. D.C. 293 (D.C. Cir. 1995)]; ANR Pipeline Co. v. FERC, 771 F.2d 507, 516, 248 U.S. App. D.C. 315 (D.C. Cir. 1985)*. The Commission's orders in this case affect Antero and other shippers' [*8] access to the liquidity and any premiums associated with PCG pools.

Antero Opening Br. 17 (first alteration in Antero's brief).

Antero neither explains nor cites any authority for the broad proposition that all pipeline customers have standing to challenge all FERC orders pertaining to pipeline "policies." The instant rule does not affect "rates" because the new

pooling service is free, just like the existing pooling service. Both cases cited by Antero involved increased rates and therefore are inapposite. *See Miss. Valley Gas, 68 F.3d at 508* ("[Petitioner] has clearly demonstrated 'injury in fact' because the FERC orders it challenges affect the rates it will pay [the natural gas company]."); *ANR Pipeline, 771 F.2d at 516* (FERC order would lead pipeline to "file for an increase in the rates it charges to [the petitioner]."). Moreover, Antero does not explain how FERC's order affects its "access to the liquidity and any premiums associated with PCG pools." Antero Opening Br. 17. Thus, Antero's standing argument is plainly inadequate.

At oral argument, Antero relied on a procedural-standing theory, which it raised for the first time in its reply brief. Oral Argument at 13:38, Antero Res. Co. v. FERC (No. *22-1278*) (describing Antero's procedural [*9] injury); Antero Reply Br. 3-8. That argument has been forfeited. Antero does not assert that it had good cause for introducing a procedural-standing argument — which is an independent, non-obvious legal theory — in its reply brief. *Cf. Twin Rivers, 934 F.3d at 614* (petitioners need good cause to introduce new standing arguments on reply).

B.

EQT also failed to properly present arguments and evidence about standing in its opening brief. EQT's allegation of harm in the standing section of its brief merely states:

> FERC's determinations in the underlying orders in this proceeding grant improper discretion over methane intensity to a single pipeline, thereby harming producers and marketers of low-methane-intensity natural gas, including EQT Energy and its affiliates—which are active participants and leaders in producing and marketing certified natural gas and lowering the methane intensity of their natural gas.

EQT Opening Br. 21.

EQT does not explain why giving Tennessee "discretion over methane intensity" will "harm" all "producers and marketers of low-methane-intensity natural gas." Nor does it cite any evidence of this alleged future "harm." This is a clear violation of *Rule 28(a)(7)*. At oral argument, EQT said that it is harmed [*10] by a world in which responsibly-sourced gas is sold through pooling rather than through a "bilateral transaction." Oral Argument at 33:50, Antero Res. Co. v. FERC (No. *22-1278*). The word "bilateral" does not appear in EQT's opening brief, and there is no evidence that the PCG pooling option will cause EQT to suffer concrete, imminent harm. The PCG pooling option has now been available for over a year, but no one has used it and no harm has occurred.

EQT's asserted injury in its briefing and at oral argument is

based upon a hypothetical chain of events. It posits that other pipelines might follow Tennessee's lead and create pooling services of their own. EQT further speculated at oral argument that its customers might shift to lower-quality products in the PCG pool, which ultimately might cause the premiums that EQT charges for its RSG to fall. Oral Argument at 51:55, Antero Res. Co. v. FERC (No. *22-1278*) (describing the potential effects of Tennessee's PCG pooling service on EQT's sales). EQT also relies on statements like the following: "In blessing the problematic proposal of one pipeline, however, FERC sent a signal that it is attempting to regulate beyond its authority, jurisdiction, [**11**] or expertise regarding the methane intensity of gas, thereby affecting *all* current and prospective producers of the same." EQT Reply Br. 7-8 (emphasis added). None of those arguments is supported by evidence.

IV.

Perhaps in an earlier era our FERC precedents did not always make clear that an injury must be imminent when a petitioner alleges a future economic injury. But our more recent precedents require a searching inquiry. They hold that a party's injury must be "concrete, particularized, actual and imminent," and "[a] harm that will not occur unless a series of contingencies occurs at some unknown future time is not" a sufficient injury to sustain standing. *Kan. Corp. Comm'n v. FERC, 881 F.3d 924, 926, 434 U.S. App. D.C. 256 (D.C. Cir. 2018)*. While injury can be established based on arguments "firmly rooted in the basic laws of economics" — and in such instances, there is no need for a "complex chain of reasoning" — petitioners fall short of demonstrating such an injury here. *Growth Energy v. EPA, 5 F.4th 1, 33, 453 U.S. App. D.C. 272 (D.C. Cir. 2021)* (internal quotations omitted). Neither of the petitioners' opening briefs provide any details of when or how the harms they describe will occur. Instead, they posit that a decrease in the price of their RSG may occur at some indefinite point in the future. Their arguments are inadequate and [**12**] unsupported by evidence. We accordingly dismiss their petitions for review.

* * *

Pursuant to *D.C. Circuit Rule 36*, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate until seven days after resolution of any timely petition for rehearing or rehearing *en banc. See Fed. R. App. P. 41(b)*; *D.C. Cir. R. 41*.

**Per Curiam**

**FOR THE COURT**:

**End of Document**

Ⓐ Neutral
As of: June 4, 2023 7:31 PM Z

# *City of Dania Beach v. United States Army Corps of Eng'rs*

United States District Court for the Southern District of Florida

July 6, 2012, Decided; July 6, 2012, Entered on Docket

CASE NO. 12-60989-CIV-COHN/ROSENBAUM

**Reporter**
2012 U.S. Dist. LEXIS 93458 *; 2012 WL 3731516

CITY OF DANIA BEACH, FLORIDA, et al., Plaintiffs, vs. U.S. ARMY CORPS OF ENGINEERS, Defendant, and BROWARD COUNTY, FLORIDA, Intervenor/Defendant.

**Prior History:** *City of Dania Beach v. United States Army Corps of Engrs, 2012 U.S. Dist. LEXIS 81625 (S.D. Fla., June 13, 2012)*

**Counsel:** **[*1]** For City of Dania Beach Florida, Rae Sandler, Grant Campbell, Plaintiffs: Angela Freda Benjamin, LEAD ATTORNEY, Thomas Neal McAliley, White & Case, Miami, FL.

For U.S. Army Corps of Engineers, Defendant: C. Scott Spear, Reuben "Ben" Schifman, U.S. Department of Justice, Environment and Natural Resources Division, Washington, DC.

For Broward County, Intervenor Defendant: Edwin Andrew Steinmeyer, LEAD ATTORNEY, Lewis Longman & Walker, Tallahassee, FL; James David Rowlee, Broward County Attorney's Office, Fort Lauderdale, FL; Michelle Diffenderfer, Lewis Longman & Walker, West Palm Beach, FL.

**Judges:** JAMES I. COHN, United States District Judge.

**Opinion by:** JAMES I. COHN

# Opinion

## ORDER DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

**THIS CAUSE** is before the Court upon Plaintiffs' Motion for Preliminary Injunction [DE 4] ("Motion"). The Court has carefully considered the Motion, Defendant U.S. Army Corps of Engineers' Response [DE 15] ("Corps Response"), Defendant/Intervenor Broward County's Response [DE 22] ("Broward County Response"), Plaintiffs' Reply to the U.S. Army Corps of Engineers' Response [DE 18] ("Corps Reply"), Plaintiffs' Reply to Broward County's Response [DE 28] ("Broward County Reply"), the argument **[*2]** of counsel at the July 3, 2012 hearing, and is otherwise fully advised in the premises.

I. BACKGROUND

Plaintiffs City of Dania Beach, Rae Sandler, and Grant Campbell (collectively "Plaintiffs") filed suit against Defendant U.S. Army Corps of Engineers (the "Corps") on May 23, 2012. Complaint [DE 1]. The Complaint challenges a permit the Corps issued which allows Intervenor/Defendant Broward County [1] to fill approximately 8.87 acres of wetlands and secondarily impact 39.17 acres of wetlands in order to expand Runway 9R/27L ("South

---

[1] On June 6, 2012, Broward County moved to intervene. **[*3]** See DE 12. The Court granted this motion on June 13, 2012, finding that Broward County was entitled to intervene as a matter of right. See DE 17.

Runway") at the Fort Lauderdale-Hollywood International Airport (the "Airport"). Id. ¶ 1. Plaintiffs contend that the Corps issued the permit without considering the impact of increased noise levels on the health of residents in neighborhoods in the City of Dania Beach, thus violating both the National Environmental Policy Act ("NEPA") and the Clean Water Act ("CWA"). Id. ¶ 2. Plaintiffs argue that the Corps authorized the permit for the South Runway despite another practicable alternative, namely a north parallel runway ("North Runway"), which would have resulted in less noise and environmental impacts. Id. ¶ 3.

Plaintiffs seek a declaration from this Court that the permit issued by the Corps violates NEPA, the CWA, and the Administrative Procedure Act ("APA"), to vacate the Corps' record of decision and the permit, and to enjoin the Corps and Broward County (collectively "Defendants") from any further construction of the South Runway until it complies with NEPA, the CWA, and the APA. Complaint at 20-21. On May 24, 2012, Plaintiffs filed the instant Motion which seeks to enjoin further construction of the South Runway while the Court considers Plaintiffs' Complaint on the merits. Both the Corps and Broward County oppose the Motion.

II. DISCUSSION

**A. Legal Standards.**

To obtain a preliminary injunction, a plaintiff must establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the defendant is not enjoined; (3) the threatened injury to plaintiff outweighs the harm an injunction may cause defendant; and (4) the injunction would not disserve the public interest. See _Levi Strauss & Co. v. Sunrise Int'l Trading Inc., 51 F.3d 982, 985 (11th Cir. 1995)_. **[*4]** "[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." _Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003)_ (quoting _McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir.1998)_ (internal citations and quotations omitted)).

The National Environmental Policy Act ("NEPA"), _42 U.S.C. §§ 4321-4370h_, is "essentially a procedural statute that requires federal agencies to inform themselves of the environmental effects of proposed federal actions." _Fla. Keys Citizens Coal., Inc. v. U.S. Army Corps of Eng'rs, 374 F. Supp. 2d 1116, 1123 (S.D. Fla. 2005)_ (citing _Sierra Club v. U.S. Army Corps of Eng'rs, 295 F.3d 1209, 1214 (11th Cir. 2002))_. When an agency proposes any "major [f]ederal action[] significantly affecting the quality of the human environment," NEPA mandates the preparation of an environmental impact statement ("EIS"). _42 U.S.C. § 4332(2)(C)_. "Agencies are not required to duplicate the work done by another federal agency which also has jurisdiction over a project." _Sierra Club, 295 F.3d at 1215_. When a **[*5]** project has both a _**lead agency**_ and cooperating agencies, a cooperating agency may adopt an EIS signed by a _**lead agency**_, provided it conducts "an independent review of the statement" and finds that its "comments and suggestions have been satisfied." Id. (quoting _40 C.F.R. § 1506.3(c)_).

"If, after the original EIS is prepared, the agency 'makes substantial changes in the proposed action that are relevant to environmental concerns,' or if there are 'significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts,' the agency is required to prepare a supplemental environmental impact statement" ("SEIS"). Id. (quoting _40 C.F.R. § 1502.9(c)(1)_). The standard for determining when a SEIS is required is "essentially the same" as the standard for determining when an EIS is required. _Id. at 1215-16_ (quoting _Envtl. Def. Fund v. Marsh, 651 F.2d 983, 991 (5th Cir. Unit A July 1981))_. [2] If "'the post-[original EIS] changes in the [project] will have a "significant" impact on the environment that has not previously been covered by the [original] EIS,'" a supplement is necessary. _Id. at 1216_ (quoting _Nat'l Wildlife Fed'n v. Marsh, 721 F.2d 767, 782 (11th Cir.1983))_.

---

[2] The **[*6]** decisions of the former United States Court of Appeals for the Fifth Circuit decided before September 30, 1981, are binding precedent in the Eleventh Circuit. _Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981)_.

The Clean Water Act ("CWA"), *33 U.S.C. § 1251, et seq.*, "prohibits the discharge of pollutants, including dredged spoil, into waters of the United States, except in compliance with various sections of the CWA." *Fla. Keys Citizens Coal., Inc., 374 F. Supp. 2d at 1124.* Section 404(a) of the act authorizes the Secretary of the Army to issue permits for the discharge of dredged or fill material into waters of the United States. *33 U.S.C. § 1344(a).* "Waters of the United States" include wetlands. *33 C.F.R. § 328.3(a), (b).*

"Challenges to agency action under NEPA are governed by the arbitrary-and-capricious standard set forth in the Administrative Procedure Act [("APA")]. *5 U.S.C. § 706(2)(A)." Wildlaw v. U.S. Forest Serv., 471 F. Supp. 2d 1221, 1231 (M.D. Ala. 2007)* (citing *Marsh v. Or. Natural Res. Council, 490 U.S. 360, 375-76, 109 S. Ct. 1851, 104 L. Ed. 2d 377 (1989)*; *N. Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1538 (11th Cir.1990)).* [3] The APA requires that a reviewing court shall "hold unlawful **[*7]** and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *5 U.S.C. § 706(2)(A).* The arbitrary and capricious review standard is a "deferential one." *Wildlaw, 471 F. Supp. 2d at 1231* (citing *Fund for Animals, Inc. v. Rice, 85 F.3d 535, 541 (11th Cir.1996)).* The court may not substitute its own judgment for that of the agency. *Id.* (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983)*; *Skinner, 903 F.2d at 1539*)). The court must also "look beyond the scope of the decision itself to the relevant factors that the agency considered . . . to ensure that the agency took a 'hard look' at the environmental consequences of the proposed action." *Sierra Club, 295 F.3d at 1216* (citations omitted).

"An agency has met its 'hard look' requirement if it has examine[d] the relevant data and articulate[d] **[*8]** a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43* (internal quotation marks omitted)). A court may overturn an agency's decision as arbitrary and capricious under "hard look" review only if: "(1) the decision does not rely on the factors that Congress intended the agency to consider; (2) the agency failed entirely to consider an important aspect of the problem; (3) the agency offers an explanation which runs counter to the evidence; or (4) the decision is so implausible that it cannot be the result of differing viewpoints or the result of agency expertise." *Id.* (citing *Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43*). The burden of establishing that the decision was arbitrary and capricious falls upon the party seeking to overturn the agency decision. *Sierra Club, 935 F. Supp. at 1565*; *Citizens for Smart Growth v. Peters, 716 F. Supp. 2d 1215, 1221 (S.D. Fla. 2010).*

## B. Plaintiffs Have Failed to Demonstrate a Likelihood of Success on the Merits.

Plaintiffs first argue that they are likely to succeed on the merits. Motion at 9. Plaintiffs contend that the Corps violated **[*9]** NEPA by failing to disclose or analyze how high noise levels caused by the South Runway expansion would affect the health of Dania Beach residents despite Plaintiffs repeatedly raising this issue with the federal agencies. Id. at 10-11. Plaintiffs also state that neither the 2008 EIS, 2011 Written Reevaluation, nor the 2011 Memorandum for Record/Environmental Assessment addressed the health effects of high noise levels on residents and that the Corps' failure to prepare a SEIS regarding these health effects "render[ed] arbitrary and capricious its decision." Id. at 11. Finally, Plaintiffs contend that the Corps violated the CWA by approving the South Runway because a practicable alternative, i.e. the North Runway, existed which would avoid or minimize wetlands impacts. Id. at 14.

Both the Corps and Broward County dispute that Plaintiffs will suffer irreparable harm. The Corps argues that it fully complied with NEPA because, as a cooperating agency, it was required to defer to the Federal Aviation Administration ("FAA") on analysis of aviation issues such as noise. Corps Response at 7. The Corps also contends that it was not required to prepare a SEIS because the 2008 EIS "extensively **[*10]** discusses noise impacts using an established methodology and the Corps reasonably relied upon it; information regarding health impacts was not

---

[3] This standard also applies to challenges under the CWA. *Sierra Club v. U.S. Army Corps of Engr's, 935 F. Supp. 1556, 1565 & n.10 (S.D. Ala.1996).*

'new'; and a mitigation plan is in place to address the impacts of noise." Id. Finally, the Corps argues that it fully complied with the CWA and that it could not consider the North Runway proposal advocated by Plaintiffs because the FAA had already rejected this alternative as impractical. Id. at 15. The Corps also points out that the D.C. Circuit Court of Appeals in *City of Dania Beach v. FAA, 628 F.3d 581, 591, 393 U.S. App. D.C. 353 (D.C. Cir. 2010)*, already determined that there was no practicable alternative to the proposed South Runway. Id. In its separately filed response, Broward County similarly contends that Plaintiffs' claims pursuant to NEPA, the CWA, and the APA are barred by the doctrine of claim preclusion as a result of this D.C. Circuit Court of Appeals decision. Broward County Response at 4. Broward County also argues that the Corps reasonably considered and rejected the North Runway alternative despite Plaintiffs' contention that it was a practicable alternative that would have minimized environmental impacts. See id. at 7

### 1. Plaintiffs Have Failed **[*11]** to Establish a Likelihood of Success on the Merits of Their NEPA Claim.

Plaintiffs first argue that the Corps violated NEPA when approving the permit for the South Runway. Motion at 9-13. Plaintiffs contend that the Corps violated NEPA by failing to consider the impact of noise levels upon the health of residents of Dania Beach despite being provided with studies which explained how noise levels might impact residents' cardiovascular health, hypertension, or the cognitive performance of children. Id. at 11. Plaintiffs argue that the Corps' failure to consider these health effects and to prepare a SEIS render the Corp's decision to issue the permit arbitrary and capricious. Id. at 12. Broward County disputes that a SEIS was necessary because the Corps was entitled to rely on the FAA's analysis of noise impacts under both NEPA and the Vision 100-Century of Aviation Reauthorization Act ("Vision 100 Act"). Broward County Response at 6. The Corps also contends that it was required to defer to the FAA on the issue of noise impacts and that it nonetheless was not required to prepare a SEIS because "the 2008 EIS extensively discusses noise impacts using an established methodology and the Corps **[*12]** reasonably relied upon it; information regarding health impacts was not 'new'; and a mitigation plan is in place to address the impacts of noise." Corps Response at 7.

"Review of NEPA claims is limited to procedural compliance with NEPA rather than the substance of the decision." *Fla. Keys Citizens Coal., Inc., 374 F. Supp. 2d at 1144*. The Court may not "call into question any reasonable agency methodologies used in arriving at its conclusion." Id. (quoting *Protect Key West, Inc. v. Cheney, 795 F. Supp. 1552, 1559 (S.D. Fla. 1992))*. Applying this narrow standard of review, the Court agrees with the Defendants that Plaintiffs have failed to demonstrate a likelihood of success on their NEPA claim.

As Broward County points out, the Vision 100 Act requires that "[t]he Secretary [of transportation, acting through the FAA] shall determine the reasonable alternatives to an airport capacity enhancement project at a congested airport or a project designated under *subsection (b)(2)*. Any other Federal agency, or State agency that is participating in a coordinated review process under this section shall consider only those alternatives to the project that the Secretary **[*13]** has determined are reasonable." *49 U.S.C. § 47171(k)*. The Act further provides that the FAA "shall be the ***lead agency*** for . . . airport capacity enhancement projects at congested airports and shall be responsible for defining the scope and content of the environmental impact statement, consistent with regulations issued by the Council on Environmental Quality. Any other Federal agency or State agency that is participating in a coordinated environmental review process under this section *shall give substantial deference*, to the extent consistent with applicable law and policy, *to the aviation expertise of the Federal Aviation Administration. 49 U.S.C. § 47171(h)* (emphasis added). Thus, the Corps, as a mere coordinating agency on this airport expansion project, was required to defer to the FAA regarding all matters of "aviation expertise." See Broward County Response at 7. [4] This necessarily includes impacts to residents from increased aviation noise. See

---

[4] In their reply to Broward County's Response, Plaintiffs assert that "[i]t has come to Plaintiffs' attention that the Corps was *not a cooperating agency at all*, which weakens Defendants' position even further." Broward County Reply at 3 n.1 (citing April 3, 2008 email frm the FAA to the Corps, Exhibit A to the Broward County Reply [DE 28-1] (emphasis in original). The Court disagrees. While this email does state the that Corps "is not a cooperating agency" on the EIS, no where does it state that the Corps is the ***lead agency***. Furthermore, as pointed out by counsel for the Corps at the July 3, 2012 hearing, the FAA Record of Decision

*Fla. Keys Citizens Coal., Inc., 374 F. Supp. 2d at 1157* (finding that the Corps could rely upon the judgment of other agencies with particular expertise related to managing sensitive marine environments); *Nat'l Mitigation Banking Ass'n v. U.S. Army Corps of Eng'rs, No. 06-cv-2820, 2007 U.S. Dist. LEXIS 10528, 2007 WL 495245, at \*22 (N.D. Ill. Feb. 14, 2007)* **[\*14]** (noting that "[w]here multiple agencies are involved, a **lead agency** prepares an EIS and a cooperating agency can adopt that EIS if it independently reviews the EIS and is satisfied that its comments and suggestions are satisfied.").

Moreover, the Court agrees with the Corps that the scope of its environmental **[\*15]** review was properly limited to the impact of the runway expansion on the nearby wetlands. *See* Corps Response at 7-9. "Although it specifies a broad range of impacts which must be considered, NEPA does not expand the authority of the Corps to either approve or disapprove activities outside waters of the United States." *Environmental Quality; Procedures for Implementing the National Environmental Policy Act (NEPA), 53 Fed. Reg. 3120, 3121 (Feb. 3, 1988)* (to be codified at 33 C.F.R. pt. 230, 325). Here, as the Corps points out, it determined that its jurisdiction was "limited to the work in jurisdictional waters" because the project was "under the purview of the FAA." October 21, 2011 Memorandum for Record, Exhibit 3 to the Declaration of Angela F. Benjamin [DE 4-8] at 8. The Corps' decision to limit its review to the waters impacted by the project should be accorded deference. *Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'r's, 401 F. Supp. 2d 1298, 1312 (S.D. Fla. 2005)* (citing *Marsh, 490 U.S. at 375-76*). Plaintiffs therefore have failed to demonstrate a likelihood that this decision will be found arbitrary and capricious. [5]

Even if the Corps was required to independently consider aviation noise impacts, Plaintiffs have failed to establish that it is likely that the Corps' failure to prepare a SEIS will be found arbitrary **[\*17]** and capricious. A SEIS should only be prepared when new circumstances "present a *seriously* different picture of the environmental impact of the proposed project from what was previously envisioned." *Fla. Keys Citizens Coal., Inc., 374 F. Supp. 2d at 1145* (citations and internal quotation marks omitted) (emphasis in original). The record here establishes that noise impacts were considered in the 2008 EIS. *See* June 2008 Final Environmental Impact Statement, Exhibit 1 to the Declaration of Angela F. Benjamin [DE 4-4] at 7-19; [DE 4-5] at 1-2. Additionally, as the Corps points out, back in January 2008, before the EIS was issued, Plaintiffs "provided FAA with more than ten recent studies that linked high aviation noise levels with stress-related health impacts." Compl. ¶ 33. The 2008 EIS reflects that the FAA received a comment regarding the adverse health effects of airport noise, but decided to apply its existing aviation noise methodology. June 2008 Final Environmental Impact Statement, Exhibit 1 to the Declaration of Angela F. Benjamin [DE 4-5] at 17. Thus, Plaintiffs have failed to demonstrate that the Corps failed to take a "hard look" at the health effects of aviation noise or that **[\*18]** the 2011 Word Health Study constitutes "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" sufficient to require a SEIS. *See 40 C.F.R. § 1502.9(c)(1)*; *City of Bridgeton v. FAA, 212 F.3d 448, 459 (8th Cir. 2000)* (declining to "second-guess the FAA's noise level findings" because "[t]he agency, not a reviewing court, is entrusted with the responsibility of considering the various modes of scientific evaluation and theory and choosing the one appropriate for the given circumstances.") (citations and internal quotation marks omitted). [6]

---

contains numerous references to the Corps' role as a coordinating agency. *See* FAA Record of Decision, Exhibit C to the Corps' Response [DE 15-3] at 7, 79, 99-100.

[5] In their reply to the Corps' Response, Plaintiffs contend that **[\*16]** "regulations prohibit the Corps from limiting its analysis to the direct effects of filling wetlands and ignoring indirect and cumulative effects, as it has done here." Corps Reply at 4. This argument misstates the issue. Where, as here, the project was under the control of another federal agency, the Corps was permitted to adopt the EIS of the **lead agency**. *See 40 C.F.R. § 1506.3(a)* (stating that cooperating agency may adopt **lead agency**'s EIS if it concludes that its NEPA requirements have been satisfied); see also *North Carolina v. City of Va. Beach, 951 F.2d 596, 605 (4th Cir. 1991)* (holding that Federal Energy Regulatory Commission was not required to perform NEPA review over portions of the project over which it did not have jurisdiction where NEPA "requirements were previously satisfied by the Corps"); *Cal. Trout v. Schaefer, 58 F.3d 469, (9th Cir. 1995)* (limiting scope of Corps review to effects of filling wetlands where another agency had the responsibility of protecting fisheries).

[6] Plaintiffs state that the only mention of health effects related to aviation noise in the 2008 EIS is an FAA response to Plaintiffs' comment "buried in an appendix to the 2008 EIS." Corps Reply at 2. Plaintiffs argue that this cannot possibly constitute a "'hard

2.  **[*19]** Plaintiffs are Collaterally Estopped from Arguing that the North Runway Alternative was a Practicable Alternative.

Broward County contends that "[t]hrough this suit, the City of Dania Beach is collaterally attacking the FAA EIS and ROD on the same grounds it asserted, or could have asserted, in the D.C. Circuit litigation." Broward County Response at 6. According to Broward County, the City of Dania Beach is "precluded from challenging the Corps' decision to adopt the FAAs EIS, ROD, and alternatives analysis, because the City already challenged the very basis for that decision and lost." Id. In their reply to Broward County's Response, Plaintiffs dispute that claim preclusion applies here. Broward County Reply at 2-3. They fail, however, to address whether issue preclusion might apply.

"The doctrine of claim preclusion (or ***res judicata***) bars the parties to an action from relitigating matters that were or could have been litigated in an earlier suit." *Shurick v. Boeing Co., 623 F.3d 1114, 1116 (11th Cir. 2010)*. A claim is barred "whenever (1) a court of competent jurisdiction has (2) rendered a final judgment on the merits in another case involving (3) the same parties and (4) the same **[*20]** cause of action." *Id. at 1116-17* (citing *Ragsdale v. Rubbermaid, Inc., 193 F.3d 1235, 1238 (11th Cir. 1999))*. The doctrine of issue preclusion or **collateral estoppel** "precludes the re-adjudication of the same issue, where the issue was actually litigated and decided in the previous adjudication, even if it arises in the context of a different cause of action." *Cmty. State Bank v. Strong, 651 F.3d 1241, 1263-64 (11th Cir. 2011)*. Where as here, the decision which supposedly has preclusive effect was rendered by a federal court, federal law of issue preclusion applies. *CSX Transp., Inc. v. Bhd. of Maint. of Way Emps., 327 F.3d 1309, 1316 (11th Cir. 2003)*. Under federal law, for issue preclusion to apply, "(1) the issue at stake must be identical to the one involved in the prior litigation; (2) the issue must have been actually litigated in the prior suit; (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that action; and (4) the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding." *Id. at 1317* (quoting *I.A. Durbin, Inc. v. Jefferson Nat'l Bank, 793 F.2d 1541, 1549 (11th Cir.1986))*.

Here, **[*21]** the City of Dania Beach previously challenged the FAA's approval of Alternative B1b, the South Runway. *City of Dania Beach, 628 F.3d at 583*. In that litigation, the City of Dania Beach challenged the approval of the South Runway under the Airport and Airway Improvement Act, the Department of Transportation Act of 1966, and Executive Order 11,990. [7] *Id. at 584*. Here, Plaintiffs bring their challenge pursuant to NEPA and the CWA. Thus, because there is not overlap between the causes of action, the Court disagrees with Broward County that claim preclusion applies. Nonetheless, the Court finds the analysis of the D.C. Circuit regarding the practicability of the North Runway persuasive and preclusive.

The D.C. Circuit found that "[e]ven assuming for the purposes of argument that **[*22]** Alternative C1 [the North Runway] would cause no impacts to wetlands, the FAA's determination was not arbitrary and capricious. . . . Alternative C1's inferiority to Alternative B1b, in its longer delays (particularly in poor weather) and the safety drawbacks of the requisite runway-crossing, render it not only imprudent under *§ 47106(c)(1)(B)* [of the Airway Improvement Act of 1982] but impracticable under the Executive Order." *City of Dania Beach, 628 F.3d at 591*. Thus, applying the same arbitrary and capricious review standard the Court must apply here, Plaintiff City of Dania Beach already litigated the issue of whether the North Runway presents a practicable alternative for Airport

---

look' sufficient to comply with NEPA." Id. Because the Court may not determine the appropriate "mode[] of scientific evaluation and theory" that the Corps must apply, the Court finds that Plaintiffs have failed to meet their burden of establishing a likelihood of success on the merits of their NEPA claim. See *City of Bridgeton, 212 F.3d at 459*.

[7] Executive Order 11,990, § 2(a), 42 Fed. Reg. 26,961 (May 24, 1977), conditions federal assistance for construction in wetlands on a finding that there is no practicable alternative. Actions taken pursuant to Executive Order 11,990 are subject to the same standard of review under the APA as actions under NEPA and the CWA. *Nat'l Wildlife Fed'n v. Babbitt, No. 88-0301, 1993 U.S. Dist. LEXIS 10689, 1993 WL 304008, at *8-9 (D.D.C. July 30, 1993)*.

expansion. Because the City of Dania Beach had a full and fair opportunity to litigate this issue before the DC Circuit, the Court finds that Plaintiffs are collaterally estopped from arguing before this Court that the North Runway alternative presents a practicable alternative for the Airport's expansion plans. See *City of Dania Beach, 628 F.3d at 584* (finding that "the agency was not arbitrary or capricious in viewing Alternative C1 as 'impracticable' within the meaning of the Executive Order.").

The **[*23]** heart of Plaintiffs' Clean Water Act claim is that the Corps violated the CWA by not selecting an alternative that was not the least environmentally damaging practicable alternative. Motion at 14. Under the CWA regulations, "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharged which would have less adverse impact on the aquatic ecosystem." *40 C.F.R. § 230.10(a)*. The regulations further provide that "[a]n alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *40 C.F.R. § 230.10(a)(2)*. Plaintiffs argue throughout their Motion that the North Runway is a practicable alternative to the South Runway. See, e.g., Motion at 14 ("The record shows that the North Parallel Runway (Alternative C1) is such a practicable alternative."). Plaintiffs contend that the "Corps' reasons for rejecting the North Parallel Runway as impracticable are legally invalid." [8] *Id.* at 15. However, because the D.C. Circuit already rejected The City of Dania Beach's argument that the North Runway was a practicable alternative, **[*24]** the Court finds that Plaintiffs are unlikely to succeed on the merits of their challenge to the permit under the Clean Water Act. [9]

3. Even if Plaintiffs Are Not Collaterally Estopped From Arguing that the North Runway Alternative was a Practicable Alternative, They Still Have Failed to Demonstrate a Likelihood of Success on the Merits of Their Clean Water Act Claim.

Even if the D.C. Circuit's opinion in City of Dania Beach does not have preclusive effect, Plaintiffs have still failed to demonstrate a likelihood of success on the merits of their CWA claim. The FAA determined that the North Runway was not a reasonable alternative due to delay, capacity, displacement, and limited potential future development. FAA Record of Decision, Exhibit C to the Corps' Response [DE 15-3] at 53. Pursuant to the Vision 100 Act, the Corps was required to give deference to the FAA's expertise and determination **[*26]** that this alternative did not serve the project purpose. *49 U.S.C. § 47171(h)*; *Nat'l Mitigation Banking Ass'n, 2007 U.S. Dist. LEXIS 10528, 2007 WL 495245, at *27* ("The Vision 100 Act makes the Corps's conclusion unassailable."). As the Northern District of Illinois held in National Mitigation Banking Association v. United States Army Corps of Engineers, a case involving a challenge to a permit issued by the Corps to fill wetlands in conjunction with proposed expansion of Chicago's O'Hare International Airport, "[r]equiring the Corps to consider other alternatives would only waste the Corps's time, because alternatives rejected by the FAA could never be selected." *2007 U.S. Dist. LEXIS 10528, 2007 WL 495245, at *24*; see also *Nat'l Mitigation Banking Ass'n, 2007 U.S. Dist. LEXIS 10528, 2007 WL 495245, at *27* ("Because the FAA found the off-site and blended alternatives to be unreasonable, the Corps was prohibited from

_____

[8] Specifically, Plaintiffs contend that (1) CWA regulations do not allow the Corps to reject an alternative because the applicant is unwilling to do it; (2) the North Runway Alternative "would achieve the planning target of maintaining average annual operational delays in 2010 below 6 minutes;" (3) the relocation of ground facilities does not render the North Runway impracticable from a constructability or cost standpoint; and (4) increased runway crossings do not create the need for additional air traffic control coordination necessitated by the North Runway do not render that alternative "unsafe." Motion at 15-16.

[9] Plaintiffs argue that "there is a different-and lesser-legal standard governing practicability under the Executive Order than there is under the Clean Water Act." Motion at 16 n.6. The Court finds this argument unpersuasive. In addition to finding the North Runway alternative impracticable under Executive Order 11,990, the D.C. Circuit also concluded that this alternative was "imprudent" within the meaning of *§ 47106(c)(1)(B)* of the Airport and Airway **[*25]** Improvement Act. Even if the Court were to find that Plaintiffs are not collaterally estopped from arguing that the North Runway is a practicable alternative, the issue here is whether Plaintiffs are likely to succeed on the merits of their CWA claim. The Court finds the D.C. Circuit's opinion highly persuasive that Plaintiffs are unlikely to succeed on the merits of their CWA claim, as discussed in more detail in subsection 3 below.

considering them in further detail and was not arbitrary or capricious in declining to do so."). That court also noted that "it was not arbitrary and capricious for the Corps to rely on the conclusions in the FEIS regarding which alternatives were reasonable under NEPA" [10] when the District of Columbia Circuit had previously found that the FAA "acted with **[*27]** great care in conducting its analysis for the EIS and ROD." 2007 U.S. Dist. LEXIS 10528, [WL] at *25 (citations and internal quotation marks omitted). Similarly here, because the FAA rejected the North Runway alternative, the Corps was not required to consider this alternative when issuing the permit. [11]

Because the Court has found that Plaintiffs have failed to meet their burden as to the first factor, the Court will deny the Motion. See Fla. Clean Water Network, Inc. v. Grosskruger, No. 3:08-cv-120-J-32TEM, 2008 U.S. Dist. LEXIS 11100, 2008 WL 435156, at *1 (M.D. Fla. Feb. 14, 2008) ("Plaintiffs having failed to demonstrate a substantial likelihood of success as to any of their claims **[*28]** against the Corps, the Court need not determine whether the other prongs of the injunction standard are met."). However, even if the Court were to find for the Plaintiffs as to this factor, the Court would nonetheless deny the Motion because, as discussed below, Plaintiffs have also failed to meet their burden as to the other three factors.

### C. Plaintiffs Have Failed to Demonstrate a Threat of Irreparable Injury.

Plaintiffs contend that they will suffer irreparable injury in the absence of an injunction because initial steps to build the South Runway extension have begun and will continue during the course of the proceedings. Motion at 17. [12] According to Plaintiffs, destruction of the wetlands, noise and air impacts from continued construction, visual blight from the runway, and "the risk implied by a violation of NEPA" are irreparable injuries that Plaintiffs will suffer. Id. at 17-18. Both Defendants challenge whether Plaintiff has demonstrated a threat of irreparable injury. The Corps contends that because Plaintiffs waited more than seven months before seeking an injunction "protection of the wetlands was not previously in the forefront of Plaintiffs' concerns related to the Runway **[*29]** project." Corps Response at 17. Broward County asserts that neither of Plaintiffs' alleged irreparable injuries-destruction of wetlands and construction impacts-are "irreparable or particularly injurious to Plaintiffs." Broward County Response at 12.

The Court finds that Plaintiffs have failed to demonstrate that they will suffer an irreparable injury. As Broward County points out, Plaintiffs have alleged "no particular personal connection with or benefit from the impacted wetlands, alleging only general platitudes about wetlands." Broward County Response at 12. Moreover, Plaintiffs' complaints about construction noise, dust, and visual blight are not tied to their causes of action which concern the impact of aviation noise upon the residents of Dania Beach. See id. Plaintiffs will not suffer any supposed ill effects from aviation noise while the runway is still under construction. See id. Finally, as the Corps points out, the permit to fill 8.87 acres of federal wetlands and to secondarily impact 39.17 acres of wetlands, was issued on November 8, 2011, and includes substantial mitigation measures. See Corps Response at 18; Permit, Exhibit 12 to the

---

[10] The court later went on to say that "[t]he corps was justified in relying on that conclusion in the CWA context just as it was in the NEPA context discussed above." Nat'l Mitigation Banking Ass'n, 2007 U.S. Dist. LEXIS 10528, 2007 WL 495245, at *27.

[11] Moreover, the North Runway alternative advocated by Plaintiffs was projected to impact 15.41 acres of wetlands versus 15.40 for the selected South Runway alternative. FAA Record of Decision, Exhibit C to the Corps' Response [DE 15-3] at Table 3, p. 36. Thus, the effect on the waters of the United States was similar under both alternatives.

[12] In their reply to Broward County's Response, Plaintiffs assert that since this lawsuit was filed, Broward County "has *increased* the rate at which it is filling the wetlands." Broward County Reply at 5 (emphasis in original). To support this contention, Plaintiffs rely upon the Declaration of Christopher Johnston, an individual who has claimed to have regularly visited the construction site since April 2012 "to monitor the pace of work." Declaration of Christopher Johnston, Exhibit B to Broward County Reply [DE 28-2] ¶ 2. The Court does not find this evidence compelling. Mr. Johnston's Declaration does not establish that wetlands are being filled due to the lawsuit rather than according to the existing schedule of work. Additionally, at the July 3, 2012 oral argument, counsel for Broward County stated on the record that the Youtube videos referenced in Mr. Johnston's Declaration are actually of the County's construction staging area and **[*30]** not wetlands.

Declaration of Angela F. Benjamin [DE 4-19]. Accordingly, Plaintiff has failed to articulate why they now face irreparable injury if the wetlands are destroyed.

## D. The Balance of Equities Do Not Weigh in Favor of a Preliminary Injunction.

Plaintiffs also argue that the irreparable **[*31]** injuries they will suffer outweigh the harms that might be suffered by the Corps as a result of any delay. Motion at 19. Plaintiffs argue that the Corps "would not be affected in any significant way by an injunction, because it would only be required to reconsider its permit decision." Id. Plaintiffs further argue that any costs of delay suffered by the Broward County Aviation Department would not be irreparable and would be minimal compared to the "irreparable harm to the Plaintiffs' environmental interests." Id. Plaintiffs also contend that Broward County's claims of harm are "exaggerated" and that Broward County brought any harm related to delay upon itself. Broward County Reply at 7. Broward County disputes that it would not suffer irreparable harm from a delay. Broward County Response at 12-13. According to Broward County, it has already expended approximately $82 million dollars in land acquisition, planning, design, and construction for the South Runway project. Id. at 13 (citing Declaration of David Roepnack, Exhibit 3 to Broward County Response [DE 22-3] ("Roepnack Decl.") ¶ 4). Broward County also asserts that Plaintiffs' claim that the North Runway alternative would save **[*32]** the County $276 million is disingenuous because Plaintiffs ignore the costs of delay and redesign if the Plaintiffs could somehow require construction of this alternative. Id. The Corps adds that the South Runway alternative, actually selected by the FAA, provides enormous public benefits. Corps Response at 20.

The Court agrees with Defendants that the alleged injury to the Plaintiffs does not outweigh the harm an injunction would cause Defendants. As discussed in Section C above, Plaintiffs have failed to demonstrate an irreparable injury. Given the immense costs to Broward County and the community at large if the construction is halted or otherwise delayed, the balance of the equities weigh in favor of denying the Motion. See Roepnack Decl. ¶ 12 (noting that aggregate delay costs would total $66,175 per day or $1,985,250 per 30-day month); Declaration of Stephen Belleme, Exhibit E to Broward County Response [DE 22-5] ¶ 3 (noting that the total economic effect of the runway expansion project is 11,000 jobs and $1.4 billion); Declaration of Douglas Webster, Exhibit D to Broward County Response [DE 22-4] ¶ 9 (noting that construction of the runway expansion project has been timed so **[*33]** that the Airport will only have to suffer one peak season with one runway). [13]

## E. The Public Interest Would Not Be Served by a Preliminary Injunction.

Finally, Plaintiffs contend that the public interest will be served by issuance of a preliminary injunction because "[i]t is in the public interest to require the Corps to follow the law. . . [and] to prevent the destruction of irreparable wetlands and the visual blight, and noise and air impacts that will result from construction of the South Runway." Motion at 20. As discussed above, both Broward County and the public would not be served by a delay of the South Runway construction. **[*34]** As the Corps notes, the South Runway alternative is designed to "address[] long-term capacity needs, and ensures the availability of future expansion and growth at the airport." Corps Response at 20. Given the vast costs of delay-both monetary and an increase in the time required to complete the South Runway expansion project- and Plaintiffs failure to articulate sufficient threat of irreparable injury, the Court finds that the public interest would not be served by an injunction. [14]

---

[13] Given that a permit has already been issued by the Corps, Broward County is proceeding with the construction in accordance with that permit, and it is Plaintiffs, not Broward County, who seek to change the status quo, the Court disagrees that Broward County brought harm upon itself by proceeding with construction contracts. See Broward County Reply at 7-8. As noted in note 12, supra, the Court does not believe that Plaintiffs have sufficiently substantiated their claims that Broward County has accelerated filling of wetlands in response to the filing of this lawsuit.

[14] Because the Court has determined that Plaintiffs are not entitled to a preliminary injunction, the Court does not consider Broward County's request that Plaintiffs be required to post an injunction bond. See Broward County Response at 15-17.

III. CONCLUSION

Based on the foregoing, Plaintiffs' Motion for Preliminary Injunction [DE 4] is **DENIED.** The Court will enter a separate order regarding scheduling of this case.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 6TH day of July, 2012.

/s/ James I. Cohn

**JAMES I. COHN**

**United States District Judge**

**End of Document**

**CERTIFICATE OF SERVICE**

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I hereby certify that I have this 29th day of March, 2024, served a copy of the foregoing document electronically through the Court's CM/ECF system on all registered counsel.

/s/ *Howard L. Nelson*
Howard L. Nelson
Kenneth M. Minesinger

Greenberg Traurig, LLP
2101 L Street, N.W., Suite 1000
Washington, DC 20037
(202) 331-3100

March 29, 2024